556 So.2d 842 (1990)
Mrs. Jan R. CARTER, et al.
v.
Emily DEITZ, et al.
No. 88-CA-0869.
Court of Appeals of Louisiana, Fourth Circuit.
January 16, 1990.
Rehearing Denied March 6, 1990.
*843 Victor E. Stilwell, Jr., William Lee Kohler, Deutsch, Kerrigan & Stiles, New Orleans, and Neal D. Hobson, Murray A. Calhoun, Wayne G. Zeringue, Jr., New Orleans, for Modjeski & Masters, defendant-appellant.
Marie Riccio Wisner, New Orleans, and Frank J. D'Amico, New Orleans, for Jan R. Carter and Lesley Carter, plaintiffs-appellees.
Michael E. Wanek, Hulse, Nelson & Wanek, New Orleans, for Continental Ins. Co., defendant-appellant.
Before CIACCIO, LOBRANO and WILLIAMS, JJ.
WILLIAMS, Judge.
Defendant, Modjeski & Masters (M & M), a professional engineering firm, was a participant in a joint venture retained by the Mississippi River Bridge Authority (MRBA) to conduct bridge safety studies. Their annual and special reports to the MRBA included the analysis of and recommendations regarding the installation of a median barrier on the Greater New Orleans Bridge (GNOB), a safety feature which would virtually eliminate cross-over type bridge accidents. Due to the anticipated adverse socio-economic effects a barrier would have on bridge users and the surrounding communities, it was the joint venture's continued advice not to install a median barrier. Based upon these recommendations and the concurring recommendations from state and federal agencies, the MRBA never installed a median barrier on the GNOB.
On August 13, 1977, the westbound Deitz vehicle crossed over the GNOB's 9 foot emergency lane, striking head-on the eastbound Carter vehicle. As a result, the jury found M & M acted negligently when it recommended against the installation of the barrier and found M & M solidarily liable with the MRBA and Emily Deitz for the injuries Jan and Lesley Carter, plaintiffs, sustained from the bridge accident.
From the judgment rendered against it for $4,666,666.67, plus interest[1], M & M appeals claiming 1) plaintiffs failed to prove M & M acted negligently in rendering its professional advice against the installation of the median barrier and 2) M & M owed no duty to plaintiffs to recommend installation of a median barrier.[2] We agree.
The record reveals plaintiffs' expert witnesses failed to establish the professional standards by which the finder of fact was to judge M & M's safety studies and recommendations, an essential element in plaintiffs' burden of proving M & M committed professional negligence. Notwithstanding that fatal omission, both the documentary and testimonial evidence adduced at trial showed M & M's safety studies were conducted competently, contained full disclosure of all pertinent data and provided reasonable and prudent recommendations about which safety measures should be implemented by the MRBA. The dilemma of whether or not a median barrier should have been installed on the GNOB *844 was a complex, multifactor issue and not one with a clear-cut answer. M & M's recommendations against installing a barrier were, therefore, an exercise of professional judgment. No competent evidence adduced at trial suggested their recommendation deviated from requisite professional standards.
The absence of a median barrier on the GNOB did not cause the bridge to be unreasonably dangerous. Consequently, the joint venture had no duty to recommend installation of a median barrier. Moreover, by implementing the intermediary safety measures which were recommended by the joint venture, such as resurfacing the GNOB's roadway, installing impact attenuators, replacing out-dated lighting, installing surveillance televisions and variable message signs, providing strict enforcement of speed limits and lowering the speed limits and by instituting a public awareness program about the need for GNOB users to maintain control over their vehicles, the MRBA upgraded the overall safety of the GNOB, maintaining the GNOB in a reasonably safe condition for reasonably prudent drivers.
The sole cause of the Carter-Deitz accident was Emily Deitz's failure to maintain proper control over her vehicle. As there is no legal basis for finding M & M liable for the Carters' damages, the liability determination against M & M is vacated, and the judgment of the trial court is reversed.
FACTS
A. Documented Interaction of the MRBA and M & M[3]
At their January, 1973 meeting, members of the MRBA voiced their concern about traffic congestion on the GNOB caused by the 90,000 automobile crossings per weekday when the bridge's designed capacity was only 50,000 to 55,000 crossings per day. The Board realized that because of its actual capacity, the GNOB was insufficient to adequately serve its users' traffic demands. As a result, its users were frustrated and maddened, which corresponded to an increase in accidents and an increase in the number of lawsuits against the MRBA.
Although the GNOB had been designed in accordance with the engineering standards current in the 1950's (the GNOB opened in 1958), during the decades which followed, engineering standards evolved. The members of the MRBA were well aware that construction modifications affecting the design and/or operation of the GNOB such as widening lanes, reversible lanes and/or median barriers, had to meet the current standards promulgated by AASHO, the American Association of State Highway Officials.[4] But if the GNOB remained unaltered, the MRBA owed no duty to the motoring public to modify the bridge to meet present AASHO standards.[5]
Moreover, in conjunction with any construction project, the Board was required to balance competing considerations. Construction disrupted traffic capacity and flow, caused safety hazards and affected access to the 9 foot emergency lane running the center lane of the GNOB. As 500 to 600 accidents and/or incidents (flat tires, stalled vehicles) occurred each month on the GNOB, with a fair portion of those happening in "peak traffic hours", the *845 Board had to determine what the people of New Orleans would tolerate in return for potential improvement.
From 1972 to 1973, the number of fatalities jumped from one to ten due to cross-over type accidents. See MRBA News Release of September 20, 1973. Consequently, at the September 25, 1973 MRBA meeting, one member declared his intent to submit a resolution for the installation of a median barrier down the center of the GNOB's emergency lane.[6] After much discussion, however, no resolution was submitted. Instead, the MRBA authorized its retained consulting engineers, the joint venture of deLaureal and M & M, to conduct a traffic safety study and make recommendations for the curtailing of fatalities and serious accidents on the GNOB.
At this meeting, Bill Conway of M & M discussed with Board members the feasibility of erecting a median barrier. Conway bluntly told them that a median barrier would eliminate the risk of vehicles crossing over the emergency lane to the opposing lanes, but it could also redirect the errant vehicles into traffic, causing non cross-over type accidents. A barrier would also reduce traffic capacity and, more importantly, prohibit access to and use of the emergency lane which was used continuously during breakdowns and accidents, and by ambulances, tow trucks, fire trucks, police and maintenance vehicles. He also advised them that, as the Board was already aware of M & M's recommendation against the installation of a median barrier on the GNOB, the Board should consider retaining independent consultants to conduct the safety study. The Board, however, declined to hire other engineers, resolving to remain with its retained consulting engineers.
At the October 16, 1973 meeting, Conway presented to the Board a preliminary traffic safety study report. He informed them that the GNOB's accident record had been studied, skidometer tests were being conducted by the Louisiana Department of Highways, bridge authorities around the country had been contacted to learn how accidents and injuries had been reduced on their respective bridges, and the Jersey Turnpike had been contacted about its variable message signs. He also reported his discussion with Grady Carlisle, with the Louisiana Department of Highways, who was of the opinion that while a concrete median barrier would virtually eliminate cross-over accidents, it could cause an increase of other types of accidents. To support this remark, Carlisle related that when his department installed a median guard rail on U.S. 190 between Baton Rouge and Krotz Springs, the cross-over accidents decreased, but the total accident rate tripled. In his opinion, a dilemma existed between eliminating the few catastrophic accidents and significantly increasing the minor accident rate. Conway also indicated the ten cross-over fatalities in 1973 might be a statistical abnormality, as the bridge's history showed much lower numbers and as the cause of the fatal accidents was the driver's loss of control, and not aspects of the bridge itself, such as a pothole.
After Conway completed his preliminary report, one Board member remarked that there appeared to be no clear cut avenue in the public's interest. Consequently, a plan to drastically reduce the number of speeders and drunk drivers on the GNOB was immediately implemented. And GNOB police officers increased the issuance of tickets from 175 a day to a rate of 389 a day.
On February 19, 1974, the joint venture transmitted its formal report to the MRBA entitled "Traffic Safety on the Greater New Orleans Bridge". The report included safety recommendations that the preparers believed would improve the GNOB's accident record without impairing its vehicular capacity and analyzed the following safety schemes:
1) strict enforcement of the present speed limit (50 mph);
2) a decrease in the speed limit to 40 mph;

*846 3) increasing skid resistance of the roadway;
4) placement of impact attenuators on all fixed obstructions;
5) installation of intermittent plastic tubes as lane delineators;
6) the use of variable message hazard warning signs; and
7) installation of a median barrier.
But to be feasible, these safety schemes had to satisfy the following criteria:
1) the scheme must accomplish the stated goal of achieving a significant reduction in serious vehicular accidents;
2) the scheme must not result in a significant decrease in traffic capacity of the facility; the Bridge is operating above its theoretical design capacity and any reduction in capacity would have serious economic consequences;
3) the scheme must not seriously reduce the effectiveness of MRBA personnel in handling accidents, breakdowns or other interruptions in the normal traffic flow, nor inhibit speedy emergency transit of police cars, fire trucks, and ambulances;
4) the scheme must adapt to the existing main span structure and approach structures without significant over-stressing; or, if overstressing exists, the affected members must be capable of being readily strengthened;
5) the scheme must be capable of being constructed in a reasonable period of time without grossly reducing traffic capacity during the construction period; and
6) the scheme must produce greater safety at a construction cost commensurate to the benefit achieved.
The report also summarized the GNOB's accident statistics and tabulated them as follows:

 TABLE I  SUMMARY OF ACCIDENTS
Calendar Year Total Vehicle Crossings No. of Accidents Injuries Fatalities
 1958 3,395,454 26 1 0
 1959 6,195,548 65 5 0
 1960 7,704,571 62 6 1
 1961 8,673,298 126 7 0
 1962 9,688,325 104 34 0
 1963 11,097,123 152 39 1
 1964* 15,144,178 328 155 2
 1965 19,148,036 507 341 4
 1966 20,818,847 498 345 4
 1967 21,874,178 390 274 1
 1968 23,552,029 469 282 4
 1969** 24,521,581 642 385 1
 1970 25,200,245 559 389 4
 1971 26,123,658 443 272 5
 1972 27,424,691 482 322 1
 1973 27,472,799 479 341 10
* Suspension of tolls  May 12, 1964
** Railing Guard rial installed  January 1969

*847
 TABLE II  ACCIDENT AND FATALITY RATES
Calendar Year Accident Rate Fatality Rate
 1958 3.24 0
 1959 4.45 0
 1960 3.41 5.50
 1961 6.16 0
 1962 4.55 0
 1963 5.80 3.82
 1964 9.18 5.60
 1965 11.22 8.85
 1966 10.14 8.14
 1967 7.55 1.94
 1968 8.44 7.20
 1969 11.09 1.73
 1970 9.40 6.73
 1971 7.19 8.11
 1972 7.45 1.55
 1973 7.39 15.42
Note: Accident rate is per 1,000,000 vehicle miles
 Fatality rate is per 100,000,000 vehicle miles

 TABLE III  COMPARATIVE BRIDGE STATISTICS
 1972 1972
 No. of 1972 Weekday 1972 ADT Accident Fatality
Bridge Lanes ADT per lane Rate Rate
Greater New Orleans 4 80,750 20,175 7.45 1.55
George Washington 14 216,227 15,445 1.45 NA
Goethals 4 55,049 13,762 0.43 NA
Walt Whitman 7 88,000 12,751 5.09 1.24
Benjamin Franklin 7 62,000 8,900 6.03 2.83
Golden Gate 6 105,056 17,009 1.32 4.09
Tappan Zee 6 67,644 11,274 NA 3.67
Note:
Accident rates and fatality rates given in this table may be unreliable due to differing reporting
methods.
NA indicates not available.
ADT indicates average daily traffic.

The report commented that the number of accidents and accident rate per million vehicle miles generally increased from the opening of the GNOB in 1958, through 1966, when the GNOB reached its practical maximum capacity of 20,000,000 crossings per year. The accident rate then stabilized *848 and, although traffic congestion continued to increase, its attendant lower speeds caused the accident rate to decrease, a normal phenomenon. The graphs also supported the theory that the number of fatalities in 1973 might be a statistical abnormality as the fatality rate for the 5 year period 1964-1968 was 6.32 per 100 million vehicle miles and the fatality rate for the 4 year period of 1969-1972 was 4.51 per 100 million vehicle miles, but the rate for the 5 year period of 1969-1973 was 6.81 per 100 million vehicle miles.[7]
The accidents that occurred between September 1, 1972 and August 31, 1973 were also analyzed. Four hundred eighty-nine accidents were recorded, with 202 involving non-fatal injuries and 7 involving fatalities. The maximum number of these accidents happened during four periods: between 6:00 a.m. to 7:00 a.m.; between 1:00 p.m. to 4:00 p.m. with a peak between 3:00 p.m. to 4:00 p.m.; between 6:00 p.m. to 7:00 p.m.; and between 11:00 p.m. to 12:00 midnight. High traffic volume corresponded to a few of these periods, with a sharp increase being noted between 6:00 a.m. to 7:00 a.m. and 3:00 p.m. to 4:00 p.m. However, the peak hour for nighttime accidents was 11:00 p.m. to 12:00 midnight and corresponded to a sharp decrease in traffic volume. The evening accidents also tended to occur on Friday and Saturday nights indicating the accidents were probably caused by higher speed driving and/or drinking while driving. The report also showed that of the 202 non-fatal accidents, 25% occurred during inclement weather, and of these, the majority happened between 1:00 a.m. to 5:00 a.m.[8] These accident conditions revealed that accidents were occurring 1) when there were restrictions on speed combined with an increase in traffic volume because traffic flow became unstable from the many stoppages, facilitating rear-enders and 2) when traffic volume was low but other factors were present such as drinking and driving, speeding and/or inclement weather.
Analyzing the fatalities, the report indicated that between 1958 and 1973, 34 fatal accidents occurred in which 38 people died. Twenty-seven accidents and 30 deaths were caused by cross-overs and 13 of the 34 accidents were alcohol related. Also 26 of the 34 occurred in the evening-night (8:00 p.m. to 7:00 a.m.) and/or on weekends. These results indicated that most of the fatalities occurred when the driver of one vehicle lost control, crossed over the emergency lane into opposing traffic, and caused a head-on collision.[9]
Based upon this analysis, the joint venture of M & M and deLaureal proposed the following safety improvements as Phase I:
1) Provide continual strict enforcement of the present maximum speed limit of 50 m.p.h.[10]
2) provide a reduced speed limit during hazardous driving conditions, through the use of special, variablemessage signing;
*849 3) placement of a 5/8" asphaltic concrete, skid resistant surfacing over the entire roadway deck;
4) placement of impact attenuators to exposed Toll Plaza guard posts; and
5) placement of a leveling course of asphaltic concrete on existing Toll Plaza.
Phase I of the initial safety program proposal did not recommend placement of a median barrier primarily because of the adverse effect a barrier would have on the traffic capacity and operation of the bridge. Instead, as it was only the fatality statistics for 1973 that pointed to a need for a median barrier, the joint venture recommended as Phase II, that installation of the barrier be deferred until 1974 accident statistics could be analyzed.
Although placement of a median barrier was not recommended for Phase I, the study contained an in depth analysis of median barriers and of four placement schemes for the barriers. The report prominently stated that a "median barrier of a size capable of resisting a vehicle collision would clearly eliminate cross-over type accidents, which are now the largest source of fatalities. However, it is less clear whether such a barrier would, on balance, reduce the overall accident rate on the bridge". (report, p. 16; emphasis added). The report also stated that each of the four barrier schemes summarized "would inhibit use of the existing emergency lane by restricting access to and from that lane". The loss of or restricted use of the emergency lane, which is used for access to accidents and breakdowns, as a detour lane around non-moving vehicles, for emergency escorts, and for police, fire and ambulance use, might "cause so much congestion as to be a source of a higher accident and congestion rate than is now experienced." (report, pp. 16-17). "Thus, while Scheme E, with the median barrier placed between the emergency lane and the downgrade lanes, is the better of the proposed schemes, it is questionable whether, on balance, it is a desirable improvement. On the one hand, it will virtually eliminate cross-over accidents; on the other hand, it will impede traffic flow, may actually increase the accident rate, and will clearly result in increased congestion. Without the unimpeded use of the emergency lane, the task of operating the facility becomes very difficult. (report, p. 17).[11]
After receiving this report, the MRBA implemented the Phase I safety programs. During 1974, the bridge was resurfaced with the anti-skid materials, police control and ticketing increased and the practicability of installing portable television cameras for traffic surveillance was investigated. Then at the December, 1974 MRBA meeting, a motion was unanimously carried authorizing the consulting engineers to evaluate and/or devise a barrier placement plan which would expedite the greatest possible traffic flow.
On January 21, 1975, on behalf of the joint venture, Bill Conway updated the February, 1974 Safety Study. His transmittal letter advised that the 1974 accident and fatality statistics had been reviewed and both indicated bridge traffic safety was improving. The warrants for a median barrier had been reviewed and the engineers continued to believe a barrier was not justified. The contents of the January, 1975 Report were discussed in detail at the January, 1975 meeting. The number of accidents had increased in 1974 from 479 to 489, while the number of accidents involving injuries/fatalities had decreased from 209 to 197. The accident rate increased from 7.39 to 7.64 because traffic volume had decreased. The number of fatalities, however, decreased from 10 to 5 but all fatalities had occurred from cross-over type accidents. Conway reiterated that a median barrier would eliminate these accidents, but he also reminded the members that *850 installation of a median barrier was not recommended.
The report also indicated that in 1974 there were 22 injury or fatality accidents involving cross-over type accidents, constituting 11.17% of the total 197 accidents. Placement of a median barrier would prevent this type of accident but would not assure elimination of fatalities nor the reduction of the GNOB's accident rate. The report also pointed out that the reduction in lane width due to the presence of a barrier could also restrict maneuvering space presently available to vehicle operators to either avoid a pending collision or minimize the severity of a collision.
Another element requiring consideration was the impact the elimination or restriction of the emergency lane would have upon bridge users and the community at large. In 1974 the emergency lane allowed emergency units to clear more than 560 motor vehicle incidents per month from the roadway, with minimum interruption to traffic. The loss or restriction of the emergency lane, hampering the clearing of incidents and/or the routing of traffic around lane blockage, would cause significant capacity decrease in peak hours resulting in increased congestion and probably additional accidents. Therefore, the joint venture recommended that Phase II of the 1974 Safety Study continue to be deferred, stating "subsequent findings may indicate that placement of a median barrier is warranted if the percentage of cross-over accidents increases." Instead, the consulting engineers recommended 1) the installation of variable message signs, 2) the implementation of a public awareness program on bridge safety, citing the GNOB's accident history, and 3) stationing the MRBA's police units on both approaches to the bridge from 11:00 p.m. to 3:00 a.m. and from 11:00 a.m. to 4:00 p.m.
A number of the Board members then voiced their concerns pro and con on the barrier installation issue, with the Board's in-house counsel reminding the members that because of the possible adverse factors such as the increased rate of accidents and the decreased ability to clear the serious and minor accidents, the law did not compel them to install a median barrier. By the discussion's end, the MRBA had created a Bridge Safety Committee, with its first assignment being to meet with the Louisiana Department of Highways to obtain an objective engineering view on the median barrier installation issue. In addition, the new safety committee commenced an investigation of alternate safety measures. On behalf of the joint venture, M & M prepared a February 17, 1975 report for the committee on the following topics: 1) placement of rumble strips in the emergency lane; 2) placement of variable message signs on the GNOB and its approaches; 3) replacement of the GNOB's original lighting with high pressure sodium lights and 4) installation of a television monitoring system.
In April of 1975, the Louisiana Department of Highways transmitted the feasibility review of median barrier placement prepared by its traffic engineers. The review stated that while a median barrier would eliminate cross-over type accidents, it would impede traffic flow resulting in increased traffic congestion that may actually increase the overall accident rate on the bridge. The report recognized that easy
access to the emergency lane is vitally necessary in order to maintain orderly and expeditious traffic flow. Placement of the barriers in various configurations on the outside edges of the emergency lane, while preserving the lane, would seriously hamper access to the emergency lane, considerably slow down the clearing operation at an accident scene and reduce bridge capacity by approximately 10-14%. A single barrier down the center of the emergency lane would hardly affect the capacity of the bridge, but the emergency lane concept would be completely abandoned. The loss of that lane might then cause so much congestion as to be a source of a higher accident and congestion rate than is currently experienced.
Therefore, because a review of statistics shows the 10 fatalities in 1973 was a statistical abnormality and only 11% of the accidents are cross-over types, "it appears that overall safety improvement would be at *851 best marginal with the addition of a barrier." Thus, the State's engineers did not recommend that a median barrier be presently installed on the GNOB.[12]
Following two cross-over accidents with five attendant deaths in May of 1975, the joint venture once again reviewed its recommendation on the median barrier installation issue. The Bridge Safety Committee had discussed the various types of barriers and barrier schemes at its June 3, 1975 meeting but had made no recommendations, deferring the resolution of the issue until the consulting engineers once again analyzed the topic. By June 12, 1975, M & M had prepared the following specific recommendation for the Committee:
* * * * * *
A median barrier of the proper type, (if installed on the Bridge) has the following advantage:
It will prevent virtually all cross-over type accidents, and therefore will virtually eliminate head-on collisions.
On the other hand, a median barrier on the Bridge has the following disadvantages:
1. It will cause a significant decrease in traffic carrying capacity of the Bridge. For example, whereas the present theoretical evening peak hour capacity toward Algiers is 2910 vehicles per hour, the theoretical capacity with the least restrictive barrier scheme drops to no more than 2210 vehicles per hour. This is a 25% reduction in capacity, and it has been calculated, taking into account the probable frequency of incidents causing stoppage of traffic.
2. The barrier in its most favorable configuration will prohibit access from the emergency lane to ½ of the Bridge roadway, and will provide comparable access as now exists to ½ of the Bridge roadway. Thus, the response time to breakdowns or accidents in that half of the Bridge roadway without emergency lane access will be much larger than at present. Whereas, a minor accident now may be cleared in 10 minutes, this time will rise to possibly 20 to 30 minutes. Whereas, a breakdown now is usually cleared in 5 minutes, this time will rise to at least 10 minutes and, possibly, 15 minutes.
3. Due to the lesser capacity of the roadway and the greater time to clear interruptions, the waiting queues during peak hours will be longer and, due to this longer wait, the number of breakdowns and possibly accidents will increase, thus further reducing actual capacity.
4. Since the barrier will forcibly redirect errant vehicles back into their lanes, the number of accidents experienced on the Bridge may actually increase. Whereas, before the competent but errant driver had a chance to recover when he wandered into the emergency lane, and return to his proper lane while under control, the barrier may return him to his lane out of control.
5. The barrier will not prevent all fatalities on the Bridge. A large majority of fatal accidents are caused by persons, whom evidence indicates, were intoxicated, or who fell asleep. The barrier will not protect all vehicles from these incompetents but, rather, will only protect the vehicles in the opposing lanes. It can be postulated that the barrier may on occasion cause a fatality by preventing prompt access to a serious accident and thus inhibiting prompt emergency treatment of injuries.
* * * * * *
Because the disadvantages enumerated above outweigh, in our opinion, the single advantage listed, and because the barrier would have such a profound negative effect on capacity, with resulting indirect social and economic consequences, we do not recommend that it be installed.
Rather, we recommend that the Authority take all other feasible and practical measures to reduce the safety *852 hazard on the Bridge. Suggested measures include the following:
I. CONTINUED FREQUENT, STEADY POLICE PATROLLING.
II. THE POSTING OF A LOWERED SPEED LIMIT AND ENFORCEMENT OF IT.
III. THE PROMPT APPREHENSION, ARREST AND PROSECUTION OF THOSE DRIVERS OBVIOUSLY UNDER THE INFLUENCE OF ALCOHOL. WITH RESTORATION OF TOLLS, SCREENING OF INCOMPETENT DRIVERS COULD BE READILY ACCOMPLISHED.
IV. THE STATIONING OF POLICE UNITS ON EACH APPROACH DURING THE EVENING-EARLY MORNING HOURS (11 p.m. to 3 a.m.).
V. TELEVISION SURVEILLANCE TO PROVIDE A PSYCHOLOGICAL DETERRENT TO SPEEDING.
These recommendations were reported to the community in the June 13, 1975, Times-Picayune article, "Engineer Recommends Against Building Safety Median Barrier on Bridge". That article prompted Frank Minyard, M.D., Coroner for the Parish of Orleans, to write to Monsignor Screen in his capacity as a MRBA Board Member. His June 13th letter called upon the MRBA "to seek other Engineering Consulting Firms (sic) opinions about the median barrier" on the GNOB. Minyard had read the engineers' recommendations in the Times-Picayune and was dissatisfied with their conclusions, he could not "believe that social and economic consequences are worth the loss of a single human life." Then, because the engineers had "admitted that a median barrier would definitely stop the head on (sic) collisions, that have killed twelve people on the bridge since I have been in this office," Minyard's letter concluded with an offer to bring his records of the twelve fatalities to the next meeting of the MRBA.
The MRBA officially received and filed the joint venture's June 12, 1975 report during its June 17, 1975 meeting. The Board then authorized itself to obtain the opinion of the engineers at the United States Department of Transportation (D.O.T.) on the median barrier installation issue. The Board also motioned that no action be taken on the joint venture's June 12th safety recommendations on the barrier installation issue until the Board received a response to its inquiries from the D.O.T.
Thereafter, members of the Safety Committee met with the D.O.T.'s engineers on June 26th in Washington, D.C. and then reviewed the highlights of this meeting with the rest of the Board at the MRBA meeting held on July 15, 1975:
"... They were amazed when they began to find out all the little details that are involved in putting up a barrier on a Bridge (sic). You know, they could just say, sitting back in Washington, well, go ahead, you want to quit killing people in head on (sic) crashes, why not a barrier? But after speaking to them for some three hours, they realized this is a much graver problem than it looks like on paper. So, they agreed to get into it, and make an in depth study ..." (O'Connor, MRBA meeting No. 340; July 15, 1975).
In the meantime, the MRBA decided to implement all secondary safety recommendations suggested by the joint venture over the previous six months. Consequently, the MRBA formally launched an "Action Plan" to improve GNOB safety, and on July 29, 1975 the MRBA held a press meeting where it issued its safety program for news release.[13] *853 *854 At the news conference the current safety measures being implemented were discussed. Those present were informed that the Safety Committee was awaiting the advice of the engineers at the United States Department of Transportation, Washington, D.C., before making any decision on the median barrier installation issue. The news release accorded this view (see footnote No. 13), stating that construction of a barrier was still under active consideration but the MRBA was currently putting alternative safety measures into effect. The news release continued with the caveat that if these alternative safety measures did not prove successful, "further deep consideration will be given to a barrier of a type [style, composition and placement scheme] as may be recommended by our Consulting Engineers."
In August, 1975 the status of this action plan was as follows:

 GREATER NEW ORLEANS BRIDGE
 ACTION PLANTRAFFIC SAFETY
 EST. IMPLEMENTATION
 PROPOSED ACTION PRIORITY TIME STATUS
 1. Construct Second Bridge 1 6 Years Permit
 Requested
 2. Reduction in Speed Limit (40
 m.p.h.) 1 1 Month Requested
 3. Prohibit Lane Changing on
 Bridge (Peak Hours Only) 1 1 Month Requested
 4. Increased Penalties for Speeding
 and D.W.I. 1 2 Months Requested
 5. More Efficient Police Force 1 Immediate Approved
 a) Increase in Numbers 1 Immediate Approved
 b) Increase in Pay Scale Dependent on Civil
 Service Requested
 c) Issuance of Citations for Major
 Violations Only 1 Immediate Approved
 6. Public Relations-Action Plan
 Announcement 1 Immediate Approved
 a) Publicize Emergency Escort
 Service
 7. Variable Message Signs 2 6 Months Under
 Design
 8. Installation of Special Speeding-Signs
 (YOU'RE SPEEDING) 2 4 Months Investigation
 9. Installation of Improved Roadway
 Lighting 2 2 Months Ready
 for bid
10. Installation of Observation
 Tower/Control Room on Main
 Bridge for Traffic Surveillance 2 6 Months Preliminary
 design
11. Vascar Surveillance 3 2 Months On Order
12. Toximeter Surveillance 3 2 Months On Order
13. Traffic Barrier Gates 3 4 Months Investigation

*855 Then on September 24, 1975, the U.S. Department of Transportation (D.O.T.) delivered the conclusions of its median barrier installation safety evaluation. The D.O.T. concluded that Scheme C (barrier down center of emergency lane) most nearly paralleled the design being adopted for design around the country, but Scheme A (existing scheme, no barrier) could not be rejected because the 9 foot separation between directions is, as it stands, a better divider than often found on major bridges. The D.O.T., however, made no specific recommendation on whether a barrier should be installed, because "a final decision can be based only on local considerations." The pertinent excerpts from the D.O.T.'s analysis stated:

* * * * * *
With respect to capacity, we confirm the consultant's [joint venture's] findings that a significant basic capacity loss would not occur with either Scheme C [barrier down the center] or Scheme E under normal operation, as compared to the existing Scheme A [no barrier, existing scheme]. Some loss would occur with Schemes B and D in normal operation. Further, the ability to handle traffic at the scene of accidents and other disabled vehicles would be seriously affected at all points by Scheme B, on upgrades by Scheme D, and on the downgrades by Scheme E. Given the considerable number of such occurrences, frequent capacity losses could be expected.
Safety Considerations
Unquestionably, the New Jersey barrier is being increasingly used, successfully, to eliminate cross-median types of accidents, including nearly all head-on accidents. It must be applied with judgment. In particular, the subject New Orleans situation is nearly unique in concept, with its central lane reserved full time for emergency vehicles, both those crossing the river on emergency trips and those servicing emergencies on the bridge. Little precedent exists.
We consider Scheme C to be entirely practical operationally; many similar high-volume traffic facilities in the country are operated quite successfully in this manner. The 25-foot roadway that would result in each direction would permit two moving lanes past a disabled vehicle in most cases. Further, portable sections of barrier (metal or concrete) could be installed at intervals to permit removal for traffic crossover under police direction during those rare occasions mentioned during the June 26 meeting, when a given direction of flow is blocked for several hours.
At this stage, we cannot look with favor on the double barrier system proposed in Scheme B. The disadvantages of restricted geometrics and inflexibility of operation appear to outweigh any of the practical advantages. To a lesser extent, the same disadvantages apply to Schemes D and E. In addition, in these two schemes (particularly Scheme E) the ends of the barrier in mid-bridge appear to introduce new hazards very likely more severe than those being corrected.
While existing Scheme A obviously has potential for head-on and opposing sideswipe accidents that Scheme C eliminates, nevertheless, Scheme A is relatively safe compared to the pure four-lane, undivided operation found on many highways and bridge structures. The emergency lane provides a 9-foot median between directions which would be considered a welcome safety feature in itself if it could be added to these other highways, assuming that through traffic could be kept out of the added area. We cannot, therefore, reject Scheme A.

Fundamentally, then, as we see it, the basic question remaining is the trade-off between an increased level of safety to bridge users provided by Scheme C, and the public safety and security offered by Scheme A to all residents of Algiers, Gretna, and vicinity (largely devoid of hospitals, as we understand it) through the provision of a clear emergency route to hospitals over the only transportation facility now available. This must remain in a question for local-resolution. It is important to recognize that medical authorities discount the value of short-time savings resulting from high-speed emergency runs as compared *856 with trips made at normal speeds. This suggests that some of the assumed advantages of Scheme A may not be real.

* * * * * *
Conclusions
We consider Scheme C to most nearly parallel the design being adopted for safety on similar facilities throughout the country. Here, it would offer more flow freedom than do most similar plans, due to the availability of the center lane. Typically, the barriers must be installed on a former centerline, thus reducing former traveled-way width. Here it would provide near-optimum capacity conditions for normal operation, within existing grade and traffic composition constraints. Further, it would provide sufficient excess width for emergency and service vehicles to "squeeze by," or for two lanes of traffic to move around most disabled vehicles.
We cannot recommend Schemes B, D, or Ewe find difficulties in each which outweigh any possible advantages.

We cannot reject existing Scheme A, because the 9-foot separation between directions is, as it stands, a better divider than often found on major bridges.

Again, we must emphasize that a final decision can be based only on local considerations. We appreciate having had the opportunity to review this matter and will be pleased to discuss our points further with you should you so desire. (emphasis added)
At the October 21, 1975 meeting of the MRBA, the Board discussed that the D.O.T. did not mandate that a median barrier be placed on the bridge; instead, the D.O.T. "just threw [the decision] right back at us." The Board was relieved that it had already implemented its "Action Plan" and the barrier issue temporarily abated.
In May of 1977, another fatal cross-over accident occurred. On May 16, 1977 the Bridge Safety Committee issued the following statement:
The Mississippi River Bridge Authority has as its primary goal the passage of as many vehicles as are possible across the river barrier each day, commensurate with a satisfactory and reasonable level of traffic safety. The Authority believes that the passage of from 80,000 to 95,000 vehicles across the bridge each weekday, coupled with an accident rate and fatality rate that have been trending downwards over the last 3 years is evidence that this goal is being accomplished.
While the Authority deplores the occurrence of the recent head-on collision on May 4, 1977 which took two lives, it is noted that the last previous fatality on the bridge was in November 1975. The following facts are noted:
1) From December 1975 through April 1977, a period of 17 months, some 40,350,000 vehicles crossed the bridge travelling a total of 100,875,000 miles without a fatality. Thus the fatality rate for that period was zero.
2) From June 1975 through April 1977, a period of 23 months, some 54,536,000 vehicles have crossed the bridge, travelling a total of 136,340,000 miles with only 1 fatality. The fatality rate for that period was .735 fatalities per 100 million vehicle miles vs. a state wide average of about 6.1.
3) In calendar years 1975 and 1976, 56,585,391 vehicles crossed the bridge travelling 141,460,000 miles with a total of 6 fatalities. (This includes the tragic accident of May 26, 1975 in which 4 persons were killed.) The fatality rate for that 2 year period was 4.25 fatalities per 100 million vehicle miles, well below the state wide average.
4) Evidence indicates that excessive speed was the proximate cause of each of the fatal accidents in 1975, 1976, and 1977.
After the fatal accident of May 26, 1975, the Authority initiated an action plan for traffic safety which included in its elements the following:
1. Reduction in Speed Limit to 40 m.p.h.
2. Toximeter Surveillance
3. Vascar Surveillance
4. Improved Roadway Lighting
5. Variable Message Signing *857 6. Special Speeding Signs
7. Increased Penalties for Speeding & DWI
8. Public Relations Program
This program was reviewed by the Office of Traffic Operations of the Federal Highway Adminstration and with their endorsement, implementation was started during the summer of 1975. We believe that this Action Program has contributed to the significant reduction in accident and fatality rates since that time.
A median barrier in several configurations was investigated and reviewed in detail in 1975 by the Authority and its Engineers. It was the recommendation at that time that a barrier or barriers should not be installed because of its profound negative effect on the capacity of the bridge coupled with its reduction in the operating efficiency of the emergency lane. The emergency lane presently provides immediate access across the bridge for emergency units such as ambulances, fire vehicles and police from other jurisdictions. This immediate access via the emergency lane has saved an undetermined number of lives in the past.
The Authority continues to believe that the installation of a median barrier is not in the best interests of the vehicular patrons of the bridge, but is continuing to study the question.
The Authority further believes that the long term and only real solution to traffic safety and capacity problems is the construction of a new parallel structure as presently proposed.
The following day, May 17, 1977, the MRBA met and discussed the May 4th speeding cross-over/accident. The Chairman of the Bridge Safety Committee declared that "[i]f anyone should share the blame for this tragedy it should be those who fought this Authority in their efforts to construct a new bridge." The Chairman then began a statistical comparison of the difference between 1971 and 1976 GNOB traffic control. He stated that in 1971-1972 only 2,184 tickets were issued while in 1975-1976 11,119 were issued; in 1971-1972 only 265 arrests were made while in 1975-1976 1,278 were made; in 1971-1972 only 7,235 incidents occurred, but in 1975-1976 22,354 occurred with an average per month increase of 603 to 1,863. He continued that approximately 325 ambulance crossings are made each month. And in the two year period between January 1, 1975 and January 24, 1977, there were six fatalities and 130 accidents with bleeding injuries. During this same period ambulances made 4,000 crossings which required use of the emergency lane. He emphasized that if aid had not been given to those injured due to the installation of a barrier, the death toll could have been greater than six. Another member then concluded that the only answer to the cross-over accident dilemma might be a parallel bridge. Nevertheless, the Board requested that the consulting engineers reevaluate the question of installing a median barrier on the bridge.
Pursuant to this request, on July 12, 1977, the joint venture sent the Board a report which included the following:
... we have restudied and reconsidered the question of installing a median barrier on the Greater New Orleans Bridge in light of the fatal accident of May 4, 1977. However, we continue to endorse and affirm the report of June 12, 1975 in which we recommended that a median barrier NOT be installed on the bridge.

Our re-study has considered the accident and fatality statistics since June of 1975, the current level of traffic service, the documented usage of the emergency lane, and the results of the Safety Action Program initiated in 1975. We believe that evidence strongly indicates the Action Program has been effective in reducing both the accident rate and the fatality rate while preserving the capacity of the bridge to pass the maximum number of vehicles.
It is our opinion that the installation of a median barrier would have a significantly negative effect on bridge capacity, causing a reduction of approximately 25%. The resulting indirect social and *858 economic consequences would be severe for the entire Metropolitan area.

Thus we do not recommend that a barrier be installed; rather, we recommend that the Safety Action Program be aggressively continued in order to control speeders and drunken drivers, and to preserve the recent improving safety record. (emphasis added)
Thereafter, on Saturday, August 13, 1977 the Deitz-Carter cross-over accident occurred. When the MRBA met for its monthly meeting on August 16, 1977 portions of the discussion centered around the lack or breakdown in consistent, overall police patrolling in the hours when accidents were happening, as tail-gating, speeding and zig-zagging were a continuing occurrence. Because traffic control is psychological, the MRB police must be visable. Discussion then returned to whether a barrier should be installed, with some members voicing pro barrier arguments while others were concerned about the adverse affects of a barrier. A motion to construct a median barrier had not been made, but one member threatened to make such a motion if anymore cross-over accidents occurred.
Thereafter, the Bridge Safety Committee met on August 19th and again on August 29th, concluding that the consulting engineers should update the statistics on the GNOB's accident rates and fatality rates, and make a technical summary of the use of a median barrier on the GNOB. Accordingly, on October 13, 1977, the joint venture submitted its comprehensive report which offered the following conclusions:
[It is] estimated that the placement of a median barrier on the Bridge would cause a 20% to 25% reduction in capacity coupled with severe operational problems. This would have the effect of causing continuous traffic congestion. Whereas, now the morning peak hours extend from about 6:00 A.M. to perhaps 9:00 A.M., that peak traffic would extend to perhaps 10:30 A.M. Likewise, the evening peak traffic might extend from 2:30 P.M. to 7:00 P.M.
The resulting consequences to the economy of this area would, in our opinion, be profoundly negative.
It has also been shown earlier that the Huey P. Long Bridge with 9 foot lanes and no possibility of crossover type accidents has an accident rate greater than the GNO Bridge and a fatality rate only slightly less. Since, with either of the overlapping barrier schemes, the lane width will be only slightly greater than the Huey Long lanes, the disquieting premise arises that perhaps a barrier will not significantly decrease total fatalities. While no conclusion can be drawn, a doubt is cast on the effectiveness of a barrier installation requiring narrow travel lanes.

We believe that the goals of the Authority should be, first, to pass a maximum amount of traffic across the span; and, second, to maintain a reasonable level of traffic safety. These goals are, in our opinion, being achieved.
However, if the more important goal is now to eliminate crossover accidents, this must be achieved at the expense of traffic capacity, to the great detriment of the people and the economy of this area. Thus the Authority is faced with a most difficult decision as to the choice of its primary goal, for the two objectives of maximum capacity versus no crossover accidents are mutually exclusive.
It is our opinion that the present situation with an unimpeded emergency lane and no center barrier is the best balance of the conflicting goals, and that a reasonable level of traffic safety has been achieved. We do not therefore recommend the installation of a median barrier. (emphasis added).
B. Procedural History
Mrs. Jan R. Carter, wife of/and Kenneth R. Carter, individually and on behalf of their minor child, Lesley H. Carter, filed this action for damages on August 14, 1978 against Emily Deitz, the driver of the vehicle that crossed over the emergency lane and struck the Carter vehicle head-on; her father, Kenneth Deitz; John Muth, the *859 driver of the vehicle that rear ended the Carter vehicle after it had already been struck by the Deitz vehicle; the MRBA; the constituent members of the MRBA, deLaureal Engineers; M & M; Steinman, Bayton, Gronquist & London; Rader and Associates; and the respective insurers of each. The Carters' petition sought $6,250,000.00 in damages and claimed, in part, that the MRBA, deLaureal, M & M, and others were liable for their part 1) in failing to design, construct, maintain and/or renovate the GNOB to minimal safety standards; 2) for failing to originally design, plan or manufacture the GNOB and/or to upgrade or renovate the GNOB with median barriers that separated the oncoming lanes of traffic which would have prevented cross-over accidents; and 3) in adopting and/or accepting as a primary goal the movement of a maximum amount of traffic at the expense of bridge users.
M & M moved for summary judgment, claiming 1) that it and/or its joint venture with deLaureal did not owe a duty to the Carters and did not proximately cause the cross-over accident and 2) that the Carters' claims were preempted by LSA-R.S. 9:2772 A(1-3). On January 11, 1983, the trial court ruled that the Carters' claim for damages based upon the original design and construction of the GNOB were in fact preempted by LSA-R.S. 9:2772. However, the claims against M & M and deLaureal based upon the engineering services they performed for the MRBA under their 1972 Joint Venture were viable. He also ruled that the question of whether a duty existed regarding engineering services rendered from 1972 to 1978 and whether it was breached is a question of fact to be established at trial.
Plaintiff's first trial commenced in March, 1984 and resulted in a mistrial. Thereafter, the Carters dismissed their claims against the Department of Transportation and Development, the MRBA, deLaureal Engineers, their respective insurers and Allstate, for a combined settlement of five million eight hundred thousand dollars ($5,800,000.00).[14] Consequently, plaintiffs' second trial, which commenced on March 5, 1987, was solely against M & M and its insurer, CNA.[15]
At the second trial, plaintiffs' primary witness for the purpose of establishing M & M's negligence and the MRBA's fault was Andrew Ramisch, a civil engineer from Maryland who is the Director of Highway Engineering, for the Institute of Safety Analysis, Inc. (TISA)[16]. The trial court accepted him as an expert in Safety Engineering, instead of an expert in civil engineering, because he was not licensed to practice civil engineering in Louisiana or in any other State. In forming his opinion, Ramisch said he utilized fifty-two publications addressing median barriers but he principally relied upon the June, 1977 AASHTO publication "A Guide in Selecting, Designing and Locating Traffic Barriers" [17] and the "State Highway Capacity *860 Manual" published in 1965. Ramisch testified that median barriers were warranted on the GNOB on August 13, 1977, because the GNOB "met the minimum requirements for consideration for a median barrier as published by AASHTO combined with the fact that there's a strong history of cross-over accident injuries and fatalities." He claimed that,
"... when you reach the condition where [the chart on page 78 of the 1977 AASHTO publication shows] the barrier is warranted, that means you have reason for looking at it [a barrier] and deciding whether it should be done. I'm not going to say warranted means absolutely required, but means this is the area under which you have a problem and better start looking at it. Now, when you have the history of cross-over fatalities and accidents, that's when it says, `Put it in' "(transcript, Vol. XL, March 10, 1987, p. 118).
In the same vein, Ramisch found that M & M's objections to barrier placement schemes D and E (placement of barrier on side of emergency lane, on either the upgrade or downgrade edge) insignificant. In his opinion, there was no professional rationale for M & M's continuous failure to recommend installation of a barrier. In his field of expertise, capacity over safety is not a sound rationale. Consequently, as installation of the barrier was technically feasible, as the bridge had a history of cross-overs and as any effect on capacity was supposition, he testified that installation of the barrier should have been recommended by M & M. Ramisch maintained this position even though a special waiver from the Louisiana Department of Highways would have been required because the modification to the GNOB under schemes C, D or E would have made the lane widths or shoulders substandard under both AASHTO and Louisiana requirements.[18]
*861 Ramisch never testified concerning the standards of a civil engineer and never testified that M & M fell below the standard of care/of conduct of its profession. Rather, his testimony made it patently clear that he was providing his own opinion. Additionally, on cross-examination, Ramisch testified as follows:
By Mr. Bott: Q. .. Do you think there might be other engineers in Louisiana that may disagree with you on whether or not barriers should have been put up or should have been recommended?
By Mr. Ramisch: A. Oh, I think that's entirely possible. I think its obvious that these particular engineers disagreed with me.
Q. I'm talking about people other than [the joint venture of M & M and deLaureal].
A. Oh, sure, there could be other people that could do that. I'm sure they wouldn't argue the fact that the median barriers would save would eliminate cross-over accidents.
Q. But they might
A. They might put more emphasis on capacity or perceived capacity than they do on safety.
Q. They might come to a different conclusion in the exercise of their engineering expertise from yours?
A. They might.
Q. Is that correct?
A. That's correct.
* * * * * *
Q. Let's go back to my original premise, my original question. You took the information provided in their report, and you came to a different conclusion as to whether a barrier should go up; is that fair?
A. That's fair.
Q. Okay. My previous question to you was whether or not there might be other civil engineers who are performing a traffic analysis or safety function who might come to the conclusion that Mr. Conway [M & M] did, as opposed to the conclusion you did?
[objections and discussion omitted]
A. There might be, yes.
Q. Did your investigation and evaluation of this case lead you to any information as to whether or not there were, in fact, other engineers who evaluated or looked at the [M & M and deLaureal] report and agreed with its conclusions?
A. Yes.
(Vol. XL, March 10, 1987, pp. 184-188)
Plaintiffs' other engineering witnesses, Dr. Robert Brenner and Associate Professor Robert Lipp, did not testify before the jury, as the transcript of Brenner's deposition in Cross v. The Mississippi River Ridge Authority, No. 78-6433, Division "H", Parish of Orleans, taken on October 30, 1980 was offered into evidence because Brenner was deceased and as Lipp's rebuttal testimony was submitted under proffer because plaintiffs had not placed him on their witness list when plaintiffs knew he was available at least six months to a year prior to trial.[19]
Like Ramisch's testimony, the testimony of Robert Brenner, deceased former principal of TISA, was not admitted for the purposes of being an expert in civil engineering as he was not licensed to practice engineering in Louisiana. He never established the professional standards of civil engineering. Moreover, in the Cross deposition *862 he testified that he did not know the standards or redesign standards, laws, codes or warrants for the State of Louisiana which were applicable to bridge and median barrier design. And, when asked if he knew the national codes, he replied that, "[n]ational codes typically don't mandate anything. National codes are typically recommendations for the state to adopt". (Plaintiff Exhibit 26, p. 198).
After reviewing the safety studies of the joint venture, but without conducting any analysis of his own, Dr. Brenner found Barrier Scheme C unsatisfactory because he felt the emergency lane was necessary and should be preserved and found Scheme B marginally satisfactory. He favored Schemes D and E, however, finding them entirely satisfactory even though minimum AASHTO standards could not be met by either scheme as the existing 10 feet, 4 inches inside lanes would have to be reduced to nine feet, 6 inches without a shoulder, and the existing 11 feet, 2 inch lanes against the guardrails, would also have to be reduced. At the same time, Louisiana's minimum design standards, promulgated by the Louisiana Department of Highways on June 22, 1972 and revised on May 19, 1978, stated that for arterial roadways, a width of 10 feet is the minimum requirement and 11 feet is the desired width and that shoulder widths for the outside lanes should be a minimum of 8 feet, with 10 feet desired and for median lanes a minimum of four feet with 6 feet desired. He also acknowledged the effects of median barriers, such as the redirection phenomenon of vehicles being redirected into traffic; the probability of an increase in minor collisions; and the psycho-physical effect the presence of a barrier has upon vehicle operators, causing them to shy away from the barrier, crowd the center lane, and slow the rate of traffic flow.
He criticized the joint venture's failure to analyze the net-work capacity of the GNOB, i.e., whether the congestion on the GNOB was on the span itself or was upstream or downstream of the span. In the absence of a net work capacity analysis, he opined that any estimate of bridge capacity such as might be caused by a median barrier was empty. Moreover, in his single visit to the GNOB wherein he traveled the bridge numerous times during non-peak hours, he concluded the inadequate capacity was the net-working downstream of the bridge, i.e., the on ramps and off ramps.
In Brenner's opinion, capacity degradation was an unacceptable reason for failing to install the barrier. He concluded that the GNOB was unreasonably dangerous because the MRBA was aware of cross-over accidents and that a median barrier would eliminate such accidents. As it was feasible to install a median barrier, and the median barrier could be installed within a few weeks for as little as $172,500.00, in his opinion, a median barrier should have been installed.
Under proffer, Robert Lipp, Associate Professor of Engineering at the University of New Orleans, testified that in his personal opinion it was a poor decision for M & M not to recommend barrier Scheme C (placement of the barrier down the middle of the emergency lane). (Vol. XLVIII, March 24, 1987, pp. 196-197). But when asked whether his testimony was "that the standard of care for all engineers, practicing engineering in the state (sic) of Louisiana is breached by that decision," he replied, "I don't know how to answer that question. You are asking me to decide for other engineers. All I can answer is for my own opinions. Obviously, I can't answer for other engineers." (Id., p. 198) Additionally, he answered affirmatively when asked whether it would be reasonable and normal to expect that when 35 engineers offer 16 different engineering studies addressing the same problems that M & M and deLaureal were studying, that 16 different recommendations or 16 different judgment calls might be made. (Id., p. 201). He testified that he had "no quarrel" with the safety studies, or the engineering practices of M & M, just their failure to recommend Scheme C. (Id., p. 211).
As part of their case-in-chief, plaintiffs also called William Conway, the partner at M & M who oversaw all of M & M's work for the MRBA. Plaintiffs' counsel questioned him regarding the GNOB bridgewidening *863 study that M & M had conducted (and completed on July 10, 1973) for the Louisiana Department of Highways. In that study, M & M examined fifteen schemes, twelve of which contained median barriers. None were found feasible, however, because of the length of time involved, the anticipated disruption to the motoring public and the traffic safety hazards which were likely to result.[20]
Concerning the February, 1974 safety study and its annual supplements that the joint venture conducted for the MRBA, the same question was put to Conway in various ways: "How many fatalities, Mr. Conway, would you all have considered enough killings before you would have recommended a median barrier to be placed on the Mississippi River Bridge?" (Vol. XLVI, March 20, 1987, p. 56). But, throughout the trial, Conway maintained that the MRBA made the decision not to install the barrier and the joint venture based its recommendation to the MRBA on numerous factors, one of which was capacity.
Through their other witnesses, plaintiffs' counsel had shown that the joint venture's report revealed barrier Schemes D and E had only a 2 to 5% reduction in capacity while Scheme C had no reduction in capacity. In its July, 1977 report to the MRBA, however, the joint venture reported that if the barriers were installed, a 25% reduction in traffic capacity would result. Conway alleviated this apparent contradiction by explaining that a distinction existed between theoretical and total capacity. The Safety Study listed the theoretical capacity reductions, i.e. the theoretical slowing of traffic that would occur due to the presence of the barrier, cross-over lanes, and/or two foot shoulders. The 25% reduction referred to the total capacity, the traffic stoppages that would result from the loss of the emergency lane whenever an incident occurred (average frequency is one very 40 to 50 minutes) which Conway predicted would cause a capacity reduction of 20%. Conway also explained that the chart on page 78 of the AASHTO yellow book did not relate to traffic situations comparable to the GNOB. Whenever plaintiffs' counsel placed the enlargement of page 78 in front of him, Conway would reiterate that the chart is intended as a guide for groundlevel roadways but not for bridges.
At the conclusion of Conway's examination under cross, plaintiffs rested and defendants moved for a directed verdict because plaintiffs' witnesses had not established M & M's negligence and plaintiffs' witnesses had established that the MRBA, not M & M, decided not to install the median barrier. The motion was denied. Thereafter, M & M called as witnesses Monsignor Arthur Screen, Louis Porterie, legal counsel to the MRBA, and Tom Short, members and former members of the MRBA, who testified that the MRBA had been considering the barrier installation issue since the 1960's. In the context of the joint venture's recommendations and the MRBA's decision, Monsignor Screen testified that the Board "had to evaluate whether it [a barrier] would give us more safety or whether in the total picture it would mean less lives, less injuries. And I think we had to make a judgment call on that." (Id., p. 137). His personal vote was against the installation of a barrier because of its negative effects. He stated that while the Board relied upon its engineers, the Board was not obliged to follow their advice.
Louis Porterie was in accord with Screen, as when he was asked whether the MRBA relied upon the professional expertise of its consulting engineers, he replied that the Board considered their recommendations along with other factors including the recommendations of the State Highway Department, the U.S. Department of Transportation and the New Orleans City Engineering and Traffic Department. It was the Board's conclusion, as a body, not to install a barrier.
To defend against plaintiffs' claim that M & M had performed substandardly, M & M relied upon the expert testimony of John Exnicios, Barnard Johnson and Joel Leisch. *864 Exnicios, a professional engineer practicing traffic engineering in Louisiana since 1949, retired in 1982 from his position as New Orleans City Traffic Engineer. The MRBA had frequently used him as a resource and had requested his input for its decisions on remedial measures for the alleviation of traffic safety hazards on the GNOB. Consequently, when the MRBA was reviewing the joint venture's February 24, 1974 Safety Study, the MRBA requested that Exnicios' department analyze the Study.
Exnicios testified that he agreed with the Study and he adamantly stated that his department did not "rubber stamp" the Study. As a professional engineer, Exnicios believed that maintenance of the emergency lane on the GNOB was important. He recognized that engineering is not an exact science and reaffirmed that traffic engineers do not confuse "warrant" with "requirements".
When questioned concerning national accident rates compared to GNOB's accident rates, an unfavorable comparison that plaintiffs' counsel frequently made, Exnicios remarked that,
"if this accident rate was limited to facilities that were operating at twice the level of their capacity which this bridge is, then I think we would have compared favorably but there are so many millions of miles involved of highways and roadways under the Federal control that operate less than capacity. I think you have to remember the key to this entire situtation is that we had (sic) a bridge that was built for about fifty thousand vehicles operating at about one hundred thousand vehicles and the statistics were nationwide and there's an awful lot of roads that are operating at ten percent of their capacity, and therefore, the frequency of accidents and the indication to have accidents is just not present as it is in the consecrated (sic) area. Much of the problem is the capacity of this bridge and the reason the barrier was not installed is because we couldn't give up precious capacity." (Vol. XLVII, March 23, 1987, p. 65).
The second expert called by M & M was Barnard Johnson, a consulting traffic engineer from California who owns his own consulting company. He had done traffic capacity studies in Baton Rouge in 1970. At the time of trial, he was a licensed engineer in California; he had been a licensed engineer in Louisiana from 1970 until 1978.
Defense counsel had hired Johnson in 1978 to review the GNOB's characteristics and the joint venture's reports. He was then to determine if the studies were properly done, consistent with good engineering practices. Accordingly, Johnson reviewed the July 1973 bridge widening study which contained 12 barrier schemes; the February, 1974 Safety Study which included the in depth review of four barrier schemes; and the supplemental safety studies, including the 1975 Action Plan. He was aware that an incident occurred on the GNOB approximately every 40 minutes and that with the emergency lane open, it took approximately 5 minutes to clear the average incident. He was also aware that a well documented characteristic of traffic flow is that rear-enders and sideswipes are generated by incidents, until the incident is cleared. Based upon the foregoing, he opined that a barrier should not have been placed upon the GNOB. He did not think a median barrier was prudent in terms of access to incidents and accidents which frequently occurred on the GNOB. Thus, his main objection to the installation of a barrier was that "it would be restrictive in terms of response to accidents, in response to incidents that are on the bridge." (Id., p. 169).
Johnson testified that the issue of whether to install a barrier was not cut and dry. He knew of no single document, guideline or regulation that required a median barrier be installed on any particular existing facility. In his opinion, the decision to install a barrier on an existing bridge was complex and involved many factors. The total operation of the bridge needed to be considered and the various benefits and disadvantages had to be weighed.
*865 It was Johnson's opinion that even Schemes D and E, the two schemes which he considered the least restrictive because they preserved the emergency lane, would still have restricted the ability of the bridge to carry traffic safely and efficiently. Therefore, based upon all the studies and data available, he concluded that from a civil engineering and traffic engineering view point, the only feasible scheme was the existing scheme: preserve the emergency lane and forsake installation of a barrier.
Johnson also concluded that all of the joint venture's studies "were consistent with everything [he] had ever seen in terms of the way to go about studying a safety issue." (Id., p. 177). The studies followed proper engineering methods and practices with fairly full disclosure of all elements involved. (Id., p. 179). In fact, the whole study was "consistent with the engineering method" and "the recommendations were sound." (Id., p. 178).
M & M's third expert witness, Joel Leisch, a civil engineer specializing in highway and traffic engineering who practiced in Illinois but did projects in Louisiana,[21] was licensed to practice civil engineering in Louisiana and had published fourteen articles, the majority of which addressed the issue of the reconstruction and rehabilitation of existing roadways and bridges for the purpose of making improvements for capacity and safety. Based upon his on-site investigation of the GNOB, his own study of the matter and his review of the joint venture's studies, it was Leisch's opinion that the joint venture's recommendations to the MRBA were reasonable. After reviewing every pertinent document and study, he concluded that the joint venture's engineering work for the years 1973 through 1977 was performed in accordance with the standards of the engineering profession in the 1970's.
Leisch discussed the local considerations which had to be considered when determining whether a median barrier should be installed on an existing bridge. For example, the GNOB carried more cars per day, per lane than any other bridge in the United States. It also had a high frequency of breakdowns or accidents which affect traffic flow. A barrier which prohibited or partially prohibited access to the emergency lane would cause a lengthening of the time needed to clear an incident. Hence, a barrier would introduce a longer period of time in which that incident could generate other incidents such as rear-enders and sideswipes. The barrier would also create accidents where a driver who might have just wandered a few feet into the emergency lane before regaining control, would hit the barrier instead, and then be redirected into traffic out of control. Consequently, in his professional opinion, a barrier would eliminate cross-over accidents, but would increase the frequency of other accidents. He pointed out that this factor was documented in research, including the June, 1977 AASHTO guidebook that states, at page 76, "[i]t should be noted that after a warranted median barrier is installed, accident severity will decrease, however, accident frequency will generally increase since the space available for return-to-the-road maneuvers is decreased." Leisch was also of the opinion that the chart on page 78 of that guidebook had "been used out of context during this entire trial", because the chart "suggested warrants for median barriers on high speed control access roadways which have relatively flat unobstructed medians." (Vol. XLVII, March 23, 1987, p. 280-281).
In sum, it was Leisch's opinion that the safety recommendations of the consulting engineers were engineering judgment and that the recommendations in the Safety Action Plan represented acceptable and prudent engineering practices. If he had *866 been given the task of conducting the Safety Study, he would have made the same recommendation as the joint venture, he would have recommended the existing scheme.[22]
During trial, M & M twice moved for directed verdict, claiming plaintiffs failed to prove professional negligence and failed to show that M & M or the joint venture made the decision not to install a median barrier on the GNOB. The trial court, however, denied both motions. The trial court also refused to comply with M & M's request for special jury charges and special interrogatories.
After deliberating, the 12 member jury unanimously responded that: 1) M & M fell below the standard of care required of a professional engineer and/or was negligent for not recommending that a median barrier be constructed on the GNOB; 2) M & M's negligence was a proximate cause of the Carters' accident and injuries; 3) Emily Deitz was negligent; 4) Emily Deitz's negligence was a proximate cause of the Carters' accident and injuries; 5) the MRBA was at fault; and 6) the MRBA's fault was a proximate cause of the Carters' accident and injuries. Accordingly, the jury awarded Jan Carter $824,000.00 for medical expenses, $76,000.00 for lost earnings, and $1,500,000 for pain, suffering and disability; and awarded Lesley Carter $1,800,000.00 for medical expenses; $700,000.00 for lost earnings and $2,000,000.00 for pain, suffering and disability, for a combined award of seven million dollars ($7,000,000.00). The trial court then reduced this award by one-third, to four million six hundred seventy-seven thousand seven hundred seventy-seven dollars and seventy-seven cents ($4,677,777.77), because M & M, Deitz and the MRBA were solidary obligors and the Carters had settled with the MRBA.[23]
M & M then moved for judgment notwithstanding the verdict and, alternatively, for a new trial or for an amended judgment. These motions asserted, in part, that plaintiffs failed to establish a prima facie case of professional negligence against M & M, that the judgment was contrary to law, and that the trial court failed to give proper instruction to the jury. Except for amendment to the award for an arithmetical error, amending it on January 5, 1988 to the sum of four million six-hundred sixty-six thousand and six hundred sixty-six dollars and 67 cents ($4,666,666.67), however, the trial court denied M & M's motions. From this judgment, M & M has devolutively appealed. Plaintiffs have answered the appeal, requesting an increased award.[24]
MERITS
Through interrogatories, the jury determined that M & M fell below the standard of care required of a professional engineer and/or was negligent in failing to recommend placement of a barrier on the GNOB; that the MRBA was at fault; and that both parties were a proximate cause of the Carters' injuries. M & M appeals these determinations *867 claiming, first, that the trial court should have granted its Motion for Judgment Notwithstanding Verdict because the jury's findings are flawed due to the jury being improperly instructed on the standard of care required of M & M, a professional engineering corporation, and on the burden of proof that plaintiff must bear. M & M alleges that erroneous jury instructions contained a combination of ordinary negligence charges and incomplete professional negligence charges which fostered a negligence determination based upon the jury's own concept of what constituted an unreasonable risk of harm rather than on M & M's failure to adhere to the standards of the engineering profession.
Second, M & M asserts that plaintiffs failed to establish a prima facie case of professional negligence because plaintiffs failed to produce expert witnesses who could establish the requisite professional standards and M & M's deviation therefrom. M & M maintains that the joint venture's recommendations on the barrier installation issue and the safety studies were a matter of professional judgment. Moreover, while two of plaintiffs three expert witnesses might have disagreed with the joint venture's ultimate recommendation, they agreed with M & M that the joint venture's safety study recommendations were a matter of professional judgment. They also acknowledged that other civil engineers might have made the same recommendations made by the joint venture.[25] Plaintiffs, therefore, not only failed to produce witnesses expert in the field of civil engineering and who were licensed to practice in Louisiana, but also failed to establish the professional standards required of civil engineers and M & M's noncompliance with those standards.
Third, as M & M is being held responsible for influencing the MRBA's decision not to install a barrier, M & M claims there is no basis for the jury's determination that the MRBA is at fault and liable for the Carters' injuries. M & M further claims that the MRBA had a non-delegable, statutory duty to decide whether installation of a barrier was in the best interest of GNOB users. Consequently, M & M also claims that the MRBA had a rational basis for its determination that a barrier not be installed and the jury was without a right to substitute its decision for that of the MRBA. Without a specific determination that the MRBA abused its discretion in deciding not to install the barrier (because the GNOB was unreasonably dangerous without a barrier), M & M claims the MRBA cannot be found at fault.
A. Establishment of the Professional Standards by Which M & M Is To Be Judged
The duty owed by the joint venture in its capacity as consulting engineers is that it would perform its services in accordance with the skill usually exercised by others of its profession in the same locality. Charles Carter & Company v. McGee, 213 So.2d 89 (La.1968); Sams v. Kendall Const. Co., 499 So.2d 370 (La.App. 4th Cir. 1986); Pittman Construction Co. v. City of New Orleans, 178 So.2d 312 (La.App. 4th Cir.1965), writ den., 248 La. 434, 179 So.2d 274 (1965). Liability is considered to rest only upon unskillfulness or negligence but not upon mere errors of judgment. Sams v. Kendall Const. Co., 499 So.2d at 374. Moreover, it is necessary to produce expert witnesses to establish the standards of care and skill against which the engineer's performance is to be judged. Sams v. Kendall Const. Co., 499 So.2d at 374; Charles Carter & Company v. McGee, 213 So.2d at 92.[26]
Over M & M's objections, the trial court provided ample ordinary negligence instructions but limited its jury charge about *868 plaintiffs' burden of proving M & M's professional negligence to the following:
An engineer owes a duty to exercise the degree of professional care and skill customarily employed by others of the same profession in the same general area.
The charge was notably lacking instruction on the fact that the expert testimony of another civil engineer familiar with the practice of civil engineering in Louisiana was needed to establish the requisite standard of care and skill against which M & M's safety studies and recommendations were to be judged.
In its Motion for Judgment Notwithstanding Verdict, M & M argued that plaintiffs failed to establish a prima facie case of negligence. But in its reasons for denying the motion, the trial court stated:
... The Court will acknowledge that although there was ample expert testimony bearing on the issue of the median barrier, no specific testimony concerning the standard of care required of civil engineers in the New Orleans area was adduced.

Nevertheless, the law in Louisiana  as in other statesis that expert testimony is not always necessary to establish negligence of a civil engineer acting in his professional capacity. Milton J. Womack, Inc. v. The House of Representatives of State of Louisiana, et al, 509 So.2d 62 (La.App. 1st Cir.1987). The jury was furnished with an interrogatory concerning the question of negligence and found from all of the facts and expert opinion introduced that Modeski (sic) & Masters, Inc. was negligent in rendering the recommendations which it furnished to the Mississippi River Bridge Authority. The Court would infer from the jury's decision that Modeski (sic) & Masters, Inc. ignored the overwhelming weight of professional opinion regarding the positive safety factors to be gained by the installation of the median barrier. It has been held that where the engineer's conduct is so manifestly below reasonable standards dictated by ordinary intelligence, it may constitute a prima facie case of either lack of degree of skill and care exercised by others in the general vicinity. Hogan Exploration vs. Monroe Assoc., 430 So.2d 696 (La.App. 2d Cir.1983).... (Emphasis added)
The trial court's reliance upon Hogan and Womack, however, is misplaced. Both Hogan and Womack involve an exception to the rule requiring expert testimony to prove an engineer's professional negligence where the negligence is an obvious act. Whether an engineer has rendered his professional judgment unskillfully is not an obvious act of negligence such as when the Hogan defendant drilled a well on the wrong site. And it is not the sort of commission or omission from which a layman could readily infer professional negligence without the testimony of an expert witness.
Expert witnesses provide jurors with a base of knowledge, background information on subjects at issue which are not possessed by the general public. The expert provides the jury with the knowledge he has gained through specialized training and experience and, which in this instance, should be verified by licensing. The jurors then apply the expert's testimony to the evidence when determinating whether requisite standards of care have been breached.
At trial, plaintiffs' expert witness, Ramisch and the deposition of Brenner, failed to establish the standard of care and skill required of professional engineers practicing in Louisiana, a prerequisite to proving M & M negligently deviated from that standard. Civil engineers like M & M can be held liable only for neglecting to practice the skill usually exercised by civil engineers in this locality. Neither Brenner nor Ramisch, however, is licensed to practice civil engineering in Louisiana. Ramisch does not practice civil engineering elsewhere and, prior to his death, Brenner admitted that he did not know Louisiana's civil engineering standards. Instead, Ramisch practices and Brenner practiced safety engineering, a form of engineering that is not separately licensed or recognized in Louisiana. Their qualifications caused us serious doubt as to whether they had ample opportunity to practically apply their engineering *869 expertise to bridge design and pre-accident safety analysis. Initially, we question whether Ramisch and/or Brenner were proper experts, qualified to establish the professional standards by which the jury was to evaluate whether M & M performed its safety study and rendered its professional judgments skillfully.
Expert testimony was needed to establish the standards of skill and care required of civil engineers practicing in Louisiana. Sams v. Kendall Const. Co., 499 So.2d at 374. Nonetheless, neither expert provided testimony setting forth the standard of skill and care by which M & M was to be judged. Rather the two experts indicated their own inclinations, that they both preferred the installation of a median barrier on the GNOB. Furthermore, Ramisch acknowledged that civil engineers practicing in Louisiana, other than deLaureal and M & M, might have made the same safety recommendation as did M & M.
Recommending whether a median barrier should be installed on the GNOB constituted an act of engineering judgment and involved complex engineering standards as well as the weighing of social and economic considerations.
Accordingly, based upon our review of the record, we find that the record not only reveals that plaintiffs failed to set forth a prima facie case of negligence and/or to establish the requisite standards of professional care and skill expected of M & M, but also overwhelmingly reveals that M & M performed its services skillfully and made its recommendations for the MRBA in a competent, professional manner. To the extent that the jury found to the contrary, it was clearly wrong.
The evidence showed that the Louisiana Department of Transportation and the Traffic Department for the City of New Orleans reviewed the joint venture's studies and recommendations and found no fault with the safety recommendations. While the United States Department of Transportation preferred barrier Scheme C, with the barrier installed down the center of the emergency lane, the federal engineers found no fault with the joint venture's recommendation to retain the existing no barrier scheme. On the other hand, the engineers at Louisiana's Department of Highways concurred with the joint venture's recommendation to maintain the existing scheme, as a barrier might increase the overall accident rate on the bridge.
M & M's expert witnesses praised the scope of the safety studies, indicated that the studies were consistent with good engineering practices, fully disclosing all pertinent elements, and that the joint venture's ultimate safety recommendations, i.e., initially deferring the installation of a barrier and then annually recommending against its installation, were sound and well supported decisions.
Even plaintiffs' evidence indicated that the barrier installation issue was a matter of professional judgment for which there was no single, apparent solution. Plaintiffs' evidence centered upon the graph on page 78 of AASHTO's 1977 guidebook which indicated a median barrier was "warranted" on highways with a median width of 10 feet or less that were serving average daily traffic of 20,000 or more vehicles.[27] The graph instructs that if its conditions are met, a median is "warranted". And, in the words of plaintiffs' witness, Ramisch, "when you reach the condition where the barrier is warranted, that means you have a reason for looking at it and deciding whether it should be done. I'm not going to say warranted means absolutely required, but means this is the area under which you have a problem and better start looking at it." (Vol. XL, March 10, 1987, p. 118).
In the joint venture's professional judgment as set forth in its safety studies, a median barrier on the GNOB would have eliminated cross-over type accidents, but would also have had a detrimental impact on the New Orleans community at-large. Accordingly, the joint venture recommended *870 less drastic safety measures which, when implemented, reduced safety hazards and significantly increased the overall safety of bridge users. While these safety measures did not prevent cross-over accidents, they reduced the risk of bridge users losing control of their vehicles and, hence, reduced the risk of cross-over accidents.
Moreover, the Safety Action Plan the joint venture recommended in 1975 included a publicity campaign which apprised GNOB users of the dangers that could occur if speed limits were not observed and proper control of vehicles was not maintained. The safety measures recommended by the joint venture insured that the GNOB was in a reasonably safe condition for reasonably prudent drivers. As the absence of a barrier did not cause the GNOB to be unreasonably dangerous, the joint venture's recommendations against the installation of a barrier was not professional negligence and the joint venture owed no duty to the MRBA or to bridge users to promote installation of a barrier.
The record reveals plaintiffs' expert witnesses failed to establish the professional standards by which M & M was to be judged, a fatal blow to plaintiffs' case of professional negligence. In the following interrogatory propounded to the jury, the jury responded affirmatively:
1. Did Modjeski and Masters fall below the standard of care required of a professional engineer and/or was it negligent in not recommending that a Median Barrier be constructed on the Greater Mississippi River Bridge?
Without evidence of a professional standard, the jury was clearly wrong in finding that M & M was negligent.
Accordingly, the liability determination against M & M is vacated. Judgment against M & M is reversed, and parties are to bear their respective costs.
REVERSED.
*871 
*872 
*873 
*874 
*875 *876 ON APPLICATION FOR REHEARING
PER CURIAM.
Regardless of the qualifications of plaintiffs' experts who testified on the subject of engineering design and/or safety engineering, those experts failed to establish the professional standards required of Modjeski & Masters. Without establishing that predicate element, plaintiffs' case fails.
Rehearing denied.
NOTES
[1] The judgment plus interest accrued from date of judicial demand totals approximately $9,000,000.00.
[2] The appellate briefs of M & M and their insurer raise numerous other issues which our ruling pretermits.
[3] The source of this section is the verbatim transcripts of MRBA meetings and the reports and letters addressed to the MRBA by M & M, the Louisiana Department of Highways and the United States Department of Transportation, which were introduced into evidence by both plaintiffs and defendants.

Note, not all of the transcripts of the monthly MRBA meetings held between January, 1973 and September, 1977 were submitted into evidence.
[4] This organization is presently the American Association of State Highway and Transportation Officials, AASHTO.
[5] The MRBA was aware that if modifications were made and the AASHO/AASHTO standards were not met, the MRBA would probably be held liable to the motoring public for each and every accident that occurred. However, if no modifications were made, even though the GNOB was outdated under current AASHO/AASHTO standards, the MRBA was not liable unless the GNOB was unreasonably dangerous. See letter of Louis B. Porterie for the MRBA to Conway at M & M, dated August 10, 1973. Defendants' exhibit 2 under proffer.
[6] The GNOB has four lanes, with the opposing lanes of traffic separated by a nine foot emergency lane.
[7] The fatality rate for Louisiana highways, generally, was 6.31 per 100 million vehicle miles in 1971 and 6.21 in 1972.
[8] The volume of traffic at those hours is at a minimum, facilitating speeding.
[9] The report also compared the GNOB to 6 other bridges, showing that the GNOB is carrying more traffic per lane, on the average, than any of the other bridges studied. See Table 3 on page 10. Accordingly, both the accident rate and the average fatality rate on the GNOB were higher than any of the respective rates reported by the other bridge authorities.

The George Washington Bridge and the Goethals Bridge both have median barriers; they reported no cross-over accidents. The Tappan Zee Bridge, the bridge example most nearly resembling the GNOB because of its number of lanes, permanent center emergency lane and because there are no barriers, reversible lanes or overhead controls, experienced 62 cross-overs between 1955 and 1973, or an average of 4.4 a year.
[10] The joint venture also advised the consideration of decreasing the speed limit to 40 m.p.h. because a speed reduction would decrease impact velocity and the probability of a driver losing control. Alternatively, because an arbitrary low speed might contribute to a greater accident rate by increasing the irritability of the vehicle operators, the joint venture recommended posting a lower speed only when traffic conditions, special circumstances or hazardous weather justified the decreased speed.
[11] Scheme A was the existing scheme of no barrier. Scheme B had two barriers placed on both sides of the emergency lane, so that the emergency lane was not accessible to bridge traffic. Scheme C had a single barrier placed down the center of the emergency lane, so that the emergency lane concept would have to be abandoned. And Schemes D and E placed the barrier between the emergency lane and the upgrade lanes (D) and the down grade lanes (E), so that it would prohibit use of the emergency lane to half the bridge roadway.
[12] In a separate letter of the same date, the Department of Highways recommended that no change be made in the posted speed limit.
[13] BRIDGE AUTHORITY LAUNCHES

"ACTION PLAN" TO
IMPROVE BRIDGE SAFETY
The Mississippi River Bridge Authority has launched an "Action Plan" to improve traffic safety on the bridge. This action plan is a deliberate assault on the basic causes of fatal and other serious traffic accidents, primarily, speeding, driving while intoxicated, reckless driving, inattention and fatigue.
A new radar surveillance unit is now operational on the bridge to monitor speed of all vehicles crossing the bridge. Also authorized for immediate implementation is an intoximeter surveillance program, designed to stop intoxicated drivers from using the bridge.
While over seven hundred traffic citations are given out by Bridge Authority police in an average month, the driving public is less aware of this surveillance because all tickets are given only after vehicles have left the span itself. A third part of the action plan is the development of a more effective police force with a greater number of police officers.
The Bridge Authority has also approved a massive public information program designed to better inform the public at large. Bumper stickers will be distributed free to drivers all over the West Bank area. The bumper stickers will serve as constant reminders for driving safety, utilizing the following appeals: "Crossing the Bridge? Think safety. Speed Kills".... and repeating the first part of the message with various closing lines, including, "Drinking is Deadly" and "Stay in Lane".
Awaiting new signs from the State Highway Department, the Bridge Authority will also be implementing basic traffic pattern changes. Within a month, the speed limit will be reduced from fifty miles per hour to forty. The Authority is investigating the purchase of electronic signs which will be triggered to flash "You're Speeding" at vehicles exceeding the speed limit on the bridge and its approaches.
Changing lanes, a cause of many accidents, will also be prohibited once a vehicle has entered the bridge approaches. Buses, trucks and slow moving traffic (and all vehicles exiting at Camp Street) must use the right hand lane only. Sign changes from the Highway Department are also awaited before this can be put into effect.
The Authority is also making formal requests to the New Orleans City Council and the Gretna City Council to increase penalties for all moving violations on the bridge.
Part of the public information campaign will be aimed at letting the public know more about the Emergency Escort Service. During all hours, but primarily in peak traffic periods, emergency vehicles or private citizens in emergency situations can stop at the Bridge Authority office to be escorted in appropriate cases over the bridge by a police patrol car. Other principal elements of the action plan include the construction of two observation tower/control rooms on the main span of the bridge itself directly over the lanes of traffic. There (sic) will be manned by personnel who can directly report on traffic problems almost instantaneously. Variable message signs will also be installed on the approaching roadways to stop or move traffic from blocked lanes during emergency situations.
Roadway lighting is also being improved and bids will be announced soon for the additional lighting installation.
The bridge plaza area will also be resurfaced in the months ahead to smooth out dips and bumps in the area of the old toll gates.
Other items under consideration as part of this over-all action plan are television monitors and traffic barrier gates.
Still under active consideration is construction of a barrier in the median lane, however, because of the approximately three hundred emergency situations when the median lane is now used each month (sic), alternative safety measures are being put into effect now. The Safety Committee and the Board Members have an open mind on a Median Barrier and, if the above safety measures do not prove successful, further deep consideration will be given to a barrier of a type as may be recommended by our Consulting Engineers.
The action plan is the direct result of the creation of a Traffic Safety Committee which has been constantly reviewing safety on the bridge. Monthly and sometimes biweekly meetings through much of 1974 and 1975 have already resulted in many safety measures already put into effect, including, the new skid resistant surface on the bridge, yellow hash marks in the emergency lane, improved lane delineators, a growing number of police officers employed and more frequent patroling (sic) and stricter enforcement of traffic laws.
Each element of the complete action plan will be tried and given a chance for success. If a program is not effective, it will be revised or discontinued, as part of the Bridge Authority's continuing dedication to making the bridge as safe and convenient as possible for the people of this area.
This plan is the result of many meetings, conferences, deliberations and discussions among [the members of the Committee; the Authority Staff; the Authority Consultants, M & M and deLaureal; legal counsel; and other experts, Mr. Grady CarlisleChief Traffic & Planning Engineer, Louisiana State Highway Department; Mr. Harry TheriotHead Traffic Engineer, Louisiana State Highway Department; Mr. John ExniciosChief Traffic Engineer, City of New Orleans and Mr. Blaise CarriereDirector of Streets, City of New Orleans.]
If this plan is successful in reducing accidents and increasing safety, we will owe that success to the gentlemen for their advise and counsel.
GREATER NEW ORLEANS BRIDGE TRAFFIC SAFETY PROGRAM
IMMEDIATE ACTION:
1. Reduce Speed Limit to 40 miles per hour as soon as signs are available from Department of Highways.
2. Increase number of Police on duty.
3. Publicize Emergency Escort Service.
4. Vascar Surveillance.
5. Use of Intoximeter.
6. Public Information Program.
ACTION APPROVED OR TO BE APPROVED BY BOARD FOR IMPLEMENTATION
1. Improved Roadway Lighting.
2. Variable Message Signs.
3. Observation and Control Rooms on Main Span for Traffic Surveillance.
4. Prohibit lane changing on Bridge (peak hours).
5. Increased penalties for all moving violations on Bridge.
6. Increase in Police Pay Scale.
7. Resurface Toll Plaza.
8. Impact Attenuators at Toll Plaza.
PLANS UNDER CONSIDERATION:
1. Traffic Barrier Gates.
2. C.C.T.V.
3. Installation of Special Speeding Signs: "You're Speeding."
4. Median Barrier.
The Safety Committee and the Board Members have an open mind on a Median Barrier and, if the above safety measures do not prove successful, further deep consideration will be given to a barrier of a type as may be recommended by our Consulting Engineers.
[14] The D.O.T.D., MRBA and their insurers settled for two million five hundred thousand dollars ($2,500,000.00); deLaureal settled for two million dollars ($2,000,000.00); and Allstate settled for one million three hundred thousand dollars ($1,300,000.00).
[15] M & M's attorney, Victor E. Stillwell, who represented M & M at the 1984 trial, had a schedule conflict so that he was unable to attend the second trial. The trial court denied M & M's request for a continuance, which was based upon Stillwell's absence. Consequently, Frederick R. Bott represented M & M at the March, 1987 trial. On appeal, one of M & M's pretermitted arguments asserts that the refusal to grant a continuance constructively denied M & M its due process and equal protection rights.
[16] TISA is a corporation which provides post-accident analysis of the cause(s) of accidents for litigants and potential litigants. Ramisch testified that his primary duty is to analyze highway accidents by studying their causes and causal relationships. He accomplishes this by reading police reports and investigating the accident scene and then making a report and/or testifying.
[17] In its introduction, AASHTO's 1977 "Guide for Selecting, Locating, and Designing Traffic Barriers" provides:

I-B Purpose of Guide
Since the publication of NCHRP Report 118(I) [published in 1971], additional research has been done in the traffic barrier area and additional inservice experience has been gained on existing traffic barrier systems. The purpose of this document is to summarize the current state of knowledge and to present specific design guidelines for highway traffic barriers. The guidelines establish the conditions which warrant barrier protection, the type of barriers available, their strength, safety, and maintenance characteristics, selection procedures, and how the barrier should be installed dimensionally or geometrically. [emphasis in the original].
* * * * * *
It has been said that a traffic barrier is like life insuranceit is good to have as long as it is not needed. Although this is an overstatement, it cannot be overemphasized that a traffic barrier is itself a hazard. Every effort should be made in the design stage to eliminate the need for traffic barriers. Existing highways should be upgraded when feasible to eliminate hazardous conditions that require barrier protection. A traffic barrier should be installed discriminately and only when it is unfeasible to remove the hazardous condition. [emphasis added].
I-C. Application of Guide
The contents of this document are intended as guidelines for those responsible for the design, installation, and maintenance of traffic barriers. It will have applications primarily to high speed facilities since the vast majority of studies to date have concerned such facilities. However, all available criteria relevant to low speed, low volume roadways are included. In this regard, the chapter on cost-effectiveness can be used to evaluate the effects of traffic conditions on traffic barrier needs. [emphasis in the original].
The guide will have applications to both new and existing roadways. Consideration should be given to the application of the principles and criteria presented in the guide for new construction. A survey of existing facilities should be made and substandard conditions should be identified with reference to the guide. Unnecessary barriers should be removed, substandard barriers should be upgraded or replaced with acceptable systems, improperly located barriers should be relocated, and, if warranted, barriers should be installed to shield hazardous conditions which cannot be removed. It is recognized that limited budgets may preclude the full implementation of these guidelines. In those cases, a priority system should be established to insure that cost-effective alternatives are employed.
The guide relates primarily to the protective aspects of traffic barriers. [emphasis in the original]. These guidelines must be considered together with social, environmental, and economic factors. [emphasis added].
Due to the complex nature of the subject matter, many of the criteria contained in this guide are by necessity based on subjective data. In some areas, only general suggestions and recommendations can be made. It can therefore not be overemphasized that application of these guidelines must be made in conjunction with sound evaluation of the facts and engineering judgment to effect the proper solution. [emphasis in the original].
[18] Compare Ramisch's testimony herein to his testimony in Marziale v. Maney, 529 So.2d 504 (La.App. 4th Cir.1988), writ den., 533 So.2d 22 (La.1988). In Marziale, Ramisch testified that the absence of a six foot shoulder adjacent to the median on the overpass for use as a refuge lane was substandard under AASHTO and was the cause of the accident. Therein, the shoulder was 1 foot, 3 inches. If Barrier Scheme C, the scheme Ramisch favored, were implemented on the GNOB, shoulders would be approximately 2 feet.
[19] Although the trial court was concerned that plaintiffs were going to use Lipp's rebuttal testimony as de facto case-in-chief testimony, the trial court's initial ruling was that Lipp could testify on rebuttal because plaintiffs had informed the court that Stillwell had deposed Lipp and neither of plaintiffs' counsel were present. However, under cross-examination it became apparent that plaintiffs' counsel had met with Lipp over the previous two years including a few months prior to trial and had given him documents, etc. Accordingly, the trial court reversed its ruling. Vol. XLVIII, March 24, 1987, pp. 170-180.
[20] If the GNOB had been widened, the construction might not have been completed until fall of 1978. (Vol. XLVI, March 20, 1987, pp. 103-107).
[21] Leisch's clients were the Departments of Transportation for the states of Massachusetts, Maryland, Virginia, North Carolina, Florida, Mississippi, Louisiana, Texas, Illinois, Iowa, Arizona, California, and Oregon.

Leisch testified that he was familiar with the standards of practice for civil engineering specializing in traffic engineering in the State of Louisiana, as he was engaged in the construction of 12 miles of Interstate 49 through Alexandria and over the Red River.
[22] Among its other witnesses, M & M also called Captain Ron Sylvia, Senior Fire Deputy Chief, and retired Police Superintendent Henry Morris who testified that the Police and Fire Departments relied upon the availability of the emergency lane and made that fact known to the MRBA. And M & M called Harry Theriot, former Chief of Engineering for the Louisiana Department of Transportation who had reviewed the joint venture's Safety Studies and then prepared the April 7, 1975 letter for W.T. Taylor's signature which stated that the La. D.O.H. felt that no median barrier should be placed on the GNOB at that time.
[23] Early in this lawsuit, Deitz's insurer, State Farm, placed its policy limits of $37,500.00 into the registry of the court.
[24] M & M sought to appeal the judgment suspensively. However, the required appeal bond of Fourteen million dollars was cost-prohibitive. Presently M & M's question of whether the suspensive appeal bond requirements of LSA-C.C.P. art. 2124 that appellant post an appeal bond equivalent to one and one-half times the amount of judgment, plus interest, is unconstitutional as violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment is under consideration by the United States Supreme Court.

On May 2, 1988 the United States Supreme Court granted a stay so that plaintiffs could not execute their judgment against M & M's assets while the devolutive appeal is pending and, in return, required M & M to post a seven hundred thousand dollar ($700,000.00) net worth bond or to preserve its assets.
[25] Plaintiffs' third expert did not address this subject.
[26] Even though no privity of contract existed between the Carters and the joint venture of M & M and deLaureal, under Marine Insurance Co. v. Strecker, 234 La. 522, 100 So.2d 493 (1957); Carroll v. Newtron, Inc., 477 So.2d 719 (La.App. 3d Cir.1985); and Williamson v. Gulf Coast Line Contracting Co., Inc., 301 So.2d 657 (La.App. 3d Cir.1974), an injured party may maintain an action against a contractor for damages sustained by that party and caused by the fault or negligence of the contractor.
[27] M & M's witness, Joel Leisch, charged that plaintiffs were misapplying this graph because it applies to ground level, high speed control access roadways, and not to existing bridges. (Vol. XLVII, March 23, 1987, pp. 280-281).