633 So.2d 638 (1993)
Dennis PINO, Jr., et al.
v.
Ferman V. GAUTHIER, et al.
Hazel E. McCLIN
v.
Ferman V. GAUTHIER, et al.
Dennis M. PINO, Jr., et al.
v.
Ferman V. GAUTHIER, et al.
Nos. 92 CA 0783-92 CA 0785.
Court of Appeal of Louisiana, First Circuit.
December 29, 1993.
*642 John Naquin, Jr. and Aub A. Ward, Baton Rouge, for plaintiff-appellee Dennis Pino, Jr., Mabel Pino and Sharon Pino.
C.F. Duchein, III, Baton Rouge, for plaintiff-appellee Hazel E. McClin.
Brent Kinchen, Kenneth Miller, and Michael Caldwell, Baton Rouge, for defendant-appellant Ferman V. Gauthier, RPM Engineering, Inc. and St. Paul Fire & Marine Ins.
Steve Adams and Russell Dornier, Baton Rouge, for defendant-appellant State of Louisiana, DOTD.
Charles Schutte, Jr., Baton Rouge, for defendant-appellee Barber Bros. Contracting Co. and Liberty Mut. Ins. Co.
Steve Wilson, Baton Rouge, for intervenor-appellee Allstate Ins. Co.
Before CARTER, LeBLANC and PITCHER, JJ.
PITCHER, Judge.
This personal injury case comes before us on appeal from a judgment notwithstanding the verdict, signed on November 25, 1991, in favor of the plaintiffs, Dennis M. Pino, Jr., and Mabel Pino (the Pinos), individually and on behalf of their daughter, Sharon E. Pino, and Hazel E. McClin, and against defendants, Ferman V. Gauthier (Gauthier), R.P.M. Engineering, Inc. (R.P.M.), St. Paul Fire and Marine Insurance Company (St. Paul), and State of Louisiana, through the Department of Transportation and Development (DOTD). All claims against Barber Brothers Contracting Company, Inc. (Barber Bros.) and Liberty Mutual Insurance Company (Liberty Mutual) were dismissed by judgment signed September 23, 1991.

FACTS
On August 19, 1988, the day of the accident involved in the instant case, Interstate-12 between the Drusilla overpass and the O'Neal Lane exit was under construction and repair. DOTD had contracted with Barber Bros. to perform the work. The extensive construction project, where additional lanes for travel were to be added for both the east and west-bound traffic, was designed so that *643 all traffic, both east and west-bound, was temporarily detoured to the north side of the permanent concrete median. East and west-bound traffic was separated by a safety zone of approximately twelve feet. The temporary, outside west-bound lane through the detoured area was situated on the former west-bound shoulder, which had been widened and overlaid with fresh asphalt. The temporary, inside west-bound lane was the existing concrete lane. The temporary east-bound lanes were concrete. The center safety zone which separated the opposing lanes of traffic was concrete, approximately twelve feet wide, and was delineated by striping and channelizing devices (flexible posts).
Around 10:00 a.m., on the day of the accident, Gauthier was en route from R.P.M., his employer, to Exxon Chemical. He was assigned a company pickup truck to use. It was raining at the time, and Gauthier had turned on his windshield wipers. Gauthier was traveling west-bound in the outside, asphalt lane. He attempted to change lanes to the inside, concrete lane and lost control of his vehicle. He traveled across the safety zone and into the oncoming east-bound traffic. Gauthier collided with a vehicle driven by Donnie Green, in which Sharon Pino was a passenger. As a result of his injuries, Mr. Green died.
Sharon, 19 years old at the time, was seriously injured. She was in a coma, with swelling of the head, contusions to and tearing in the lungs, and fractured collar bones, ribs, and hands. Sharon was pregnant; however, the baby died. Sharon awoke from the coma, but the accident has left her with permanent brain injuries.
In multiple suits, the Pinos, Sharon, and Hazel McClin, Mr. Green's mother, sued Gauthier; R.P.M.; R.P.M.'s liability insurer; St. Paul; DOTD; Barber Bros.; and Barber Bros.'s liability insurer; Liberty Mutual. The cases were consolidated and tried in a bifurcated fashion, with the judge as trier-of-fact of DOTD and the jury as trier-of-fact of all non-governmental defendants.
After an eleven-day trial, special interrogatories and a jury verdict form were submitted to the jury. While the jury was deliberating, the trial judge ruled on the case against DOTD, assessing it with 25 percent fault. The judge took the issue of quantum under advisement, pending the jury's verdict and further consideration by the court.
Subsequent to the judge's ruling, the jury rendered its verdict, finding Gauthier, R.P.M., and DOTD negligent and assigning 1 percent fault to Gauthier, 34 percent to R.P.M., and 65 percent to DOTD. Damages were assessed as follows:

I. Damages of Sharon Pino
 A. Past, Present and Future General Damages (Physical Pain and
 Suffering, Mental Anguish, Disfigurement, Disability, Humiliation,
 Embarrassment, Loss of Enjoyment of Life)..................................$ 1,000,000.00
 B. Loss of Love, Service, Society, Companionship of Renee Elizabeth
 Pino, her unborn baby......................................................$ 50,000.00
 C. Past and Future Lost Wages.................................................$ 175,000.00
 D. Past Medical Expenses, including Hospital and Therapeutic Expenses
 ...........................................................................$ 325,977.85
 E. Future Care Costs, including Medical Costs and Evaluation, Therapeutic
 Evaluation and Treatment, Attendant Care and Case
 Management or Sustained Living in Rehabilitation Home, Support
 Care and Equipment.........................................................$ 3,000,000.00
 F. Home Modification Expenses.................................................$ 49,547.38
 ______________
 TOTAL DAMAGES OF SHARON PINO...............................................$ 4,600,525.23
 ==============
II. Damages of Mabel Pino
 A. Past and Future Loss of Love, Society, Companionship, and
 Service of her daughter, Sharon E. Pino..................................$ 250,000.00
 ==============
III. Damages of Dennis Pino
 A. Past and Future Loss of Love, Society, Companionship, and
 Service of his daughter, Sharon E. Pino...................................$ 250,000.00
 ==============

*644
IV. Damages of Hazel McClin
 A. Survival Action: Past General Damages of Physical Pain and
 Suffering of Donnie W. Green................................$ 50,000.00
 B. Loss of Love and Affection for Donnie W. Green .............$ 250,000.00
 C. Past Medical Expenses.......................................$ 41,446.45
 ____________
 TOTAL DAMAGES OF HAZEL McCLIN...............................$ 341,446.45
 ============

On September 3, 1991, the trial court issued Written Reasons for Judgment, finding the quantum reasonable and not excessive. A Judgment was signed September 23, 1991, pursuant to the jury verdict as to liability, percentage of fault and damages; however, the judgment stated, in part:
[I]n accordance with LSA-R.S. 13:5105, `No suit against the state or state agency or political subdivision shall be tried by a jury,' and further that in accordance with that statute, this court has decided all issues as to the governmental defendant, State of Louisiana through the Department of Transportation and Development, and finds the State of Louisiana through the Department of Transportation and Development 25% at fault.
Upon motion by all defendants for judgment notwithstanding the verdict and/or for new trial, the trial judge rendered a judgment notwithstanding the verdict on November 25, 1991, in which fault was assessed as follows: Gauthier 33 1/3 percent, R.P.M. 33 1/3 percent, and DOTD 33 1/3 percent; the loss of consortium awards of Dennis Pino and Mabel Pino were reduced from $250,000.00 each to $150,000.00 each. The remaining aspects of the motion for judgment notwithstanding the verdict were denied, and all other remaining provisions of the September 23, 1991, judgment were affirmed. The motions for new trial by defendants were also denied. All remaining defendants appealed, and the Pinos answered.
The assignments of error raised by DOTD are that the trial court erred in:
1. holding DOTD had a duty to place a temporary concrete median barrier throughout the construction zone;
2. holding the failure of DOTD to provide a median barrier was the cause-in-fact of the accident;
3. allowing the use of the American Association of State Highway and Transportation Officials (AASHTO) Barrier Guide for the purpose of establishing a duty to provide a median barrier;
4. excluding testimony by DOTD and Federal Highway Administration engineers;
5. excluding statistical evidence;
6. granting a motion for judgment notwithstanding the verdict instead of granting a new trial;
7. utilizing the jury findings as to quantum;
8. exculpating Barber Bros.;
9. allowing plaintiffs' expert witnesses to give expert opinion testimony concerning reasonable engineering judgments.
Gauthier, R.P.M., and St. Paul assign as error the trial court:
1. granting of a judgment notwithstanding the verdict;
2. refusing to admit a videotaped computer simulation;
3. awarding excessive monetary damages for future medical care and loss of consortium.
The Pinos answered the appeal and assign as error the trial court:
1. exculpating Barber Bros.;
2. granting a judgment notwithstanding the verdict reducing the loss of consortium award of the Pinos from $250,000.00 each to $150,000.00 each;
3. awarding inadequate general damages to Sharon Pino.

*645 I.

A. FINDING A DUTY ON DOTD TO INSTALL A TEMPORARY CONCRETE MEDIAN BARRIER
DOTD argues that several errors were made which resulted in the judge incorrectly finding a duty on DOTD to install a temporary concrete median barrier to separate the east and west-bound traffic. These errors include: A) finding DOTD had a duty to install a barrier; B) allowing the use of the AASHTO Barrier Guide to establish a duty to install a barrier; C) excluding testimony by DOTD and Federal Highway Administration engineers concerning the decision not to install a barrier; D) excluding statistical evidence which would have demonstrated the relative safety of the construction area; and, E) allowing plaintiffs' expert witnesses to give opinion testimony concerning reasonable engineering standards.
DOTD argues the trial court erred in finding DOTD's duty to install a barrier. DOTD's duty has been specifically enunciated by statute and case law. LSA-R.S. 48:35 mandates that DOTD "shall adopt specific minimum safety standards with respect to highway and bridge design, construction, and maintenance." DOTD has a duty to maintain public highways in a reasonably safe condition and remedy conditions that make the roadway unsafe. Boudreaux v. Farmer, 604 So.2d 641, 650 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (1992). The Supreme Court held in Sinitiere v. Lavergne, 391 So.2d 821, 824-825 (La.1980), as follows:
It has been repeatedly stated that the Department is not a guarantor of the safety of travelers but, rather, owes a duty to keep the highways and its shoulders reasonably safe for non-negligent motorists. Liability based upon negligence is imposed when the Department is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time. (Footnote omitted.)
We also note, from Von Cannon v. State, Department of Highways, 306 So.2d 437, 442 (La.App. 3rd Cir.), writs denied, 309 So.2d 681, 682 (1975), that the duty of DOTD to maintain highways in a safe condition "includes the duty of providing adequate warnings of and safeguards against dangerous conditions in the highway. There is no hard and fast rule as to the types of warnings or safeguards.... Safeguards should be commensurate with the danger."
As recognized in Brandon v. State, Through Dept. of Highways, 367 So.2d 137, 142 (La.App. 2nd Cir.), writ denied, 369 So.2d 141 (1979), the duty of DOTD not to create a defect or hazard in the highways varies with circumstances, and the standard of care required in a construction area is acknowledged to be somewhat lower.
Recognizing the necessity of construction work in the maintenance of highways and that hazards will often necessarily exist during the course of construction, this duty is relaxed in connection with construction activities according to the reasonable necessities of the circumstances. The Department's duty during the course of construction is usually discharged by the giving of adequate warning. What constitutes adequate warning depends on the nature of the hazard to be guarded against.
Brandon v. State, 367 So.2d at 142-43.
Therefore, the critical question in the instant case is: Did DOTD breach its duty to design, construct, and maintain safe road conditions for the motoring public in this construction zone when it failed to place a temporary concrete median barrier within the safety area between opposing lanes of traffic?
Initially, we note the original design of the project did not include placement of a temporary concrete median barrier. According to the testimony of Mr. Lacey Glascock, Traffic and Planning Administrator for DOTD, during the early stages of planning of the construction and repair of I-12, DOTD officials considered a temporary median barrier due to concerns over head-on collisions, but that the idea was rejected, in part, due to the cost. Many of the individuals involved with the construction project admitted to multiple concerns over safety at the construction site. These concerns were due, in part, to the large volume of daily traffic in the area, speeding by the traveling public, rain water *646 standing on the road surface, the poor condition of the road surface, and unclear or inadequate striping delineating the travel lanes.
During construction, the idea of a median barrier was rejected by the construction department after an official plan change, Plan Change No. 10, submitted by Mr. Humberto Gutierrez, Project Engineer for DOTD, was requested. The plan change suggested adding 240 temporary, precast barriers to the construction project. These were to be used to erect, within the safety zone, a temporary concrete median barrier between the opposing lanes of traffic in the detoured area. The proposal stated, in part:
The main purpose of this plan change is safety. This project has been under construction for 11 months and there has already been 3 casualties. Presently, the traffic is using the East bound and West bound roadways. In phase 11 Stage 11, the West bound will be used for four (4) way traffic because the East bound traffic has to be diverted into the West bound roadway separated by a 12' lane with channelizing devices (flexible posts). This will create a big hazard due to the fact that the motorist do not obey the speed limit of a job under construction and when it rains by previous experience I have seen several cars lose control and end up in the ditches. This means that we won't be able to avoid head on collisions or casualties that may occur if we do not take some action. Therefore, this plan change and/or special agreement is necessary.... They [the barriers] will be utilized in future projects all over the state and in the long run it will be cheaper and we may save a few lives.
Although the exact placement of the barrier within the safety zone was not determined before the plan change was submitted, DOTD and Barber Bros. employees and engineers had discussed the need for the barrier in order to reduce head-on type collisions between the opposing lanes of traffic.
According to Mr. P.J. Frederick, former Chief Construction Engineer for DOTD, a proposed plan change follows a general route up the chain of command within DOTD, beginning with either the contractor or the DOTD project engineer or design personnel. A written plan change is prepared, describing the change requested, including engineering reasons for the change and details on any cost changes. Signatures of the project engineer, the contractor, and the DOTD district construction engineer are obtained and the plan change is then circulated at DOTD headquarters. In this case, the proposed plan change went to Mr. Gary Doyle for review and recommendation, then to Mr. Earl Cryar, Mr. Doyle's superior, then to the chief engineer, Mr. Frederick. Each of these individuals from DOTD testified.
Mr. Doyle testified regarding his concerns over the tunneling effect[1] the barriers might cause. Mr. Cryar stated he rejected the plan change because he felt there was no reason for the change. Mr. Frederick, former Chief Construction Engineer, testified he rejected Plan Change No. 10 based on safety reasons, his concerns over the tunneling effect the barrier might cause, and his belief the barrier would not be effective in reducing head-on collisions. However, testimony from on-site engineers and employees of both DOTD and Barber Bros. supported the need for a barrier placed between the two oncoming lanes of traffic. Mr. Gutierrez's plan change was submitted after construction actually began, and his concerns about head-on collisions increased. Mr. Louis Wittie, an employee with Barber Bros., wrote to Mr. Gutierrez concerning the need to install a barrier. With on-coming lanes of traffic separated by only approximately 12 feet of open roadway, Mr. Wittie was concerned about the increase in the incidence of skidding and loss of control by drivers after rain showers or when there was standing water on the road surface.
Mr. Gutierrez's assistant, Ms. Terry Robinson, Engineer Trainee, and Mr. Thomas Bergeron, Mr. Gutierrez's supervisor, all agreed that a barrier was needed. Mr. Carlisle Richard, District Administrator for *647 DOTD, also concurred in the decision to erect a barrier between the lanes of traffic.
Testimony by the employees and individuals on location each day during the construction project clearly confirms the recognition of the need to protect the traveling public from the hazards of head-on collisions within the construction zone. This need to protect the traveling public is mandated by DOTD's duty to adopt standards which will maintain the roadway in a reasonably safe condition. The construction zone was not reasonably safe for the traveling public; DOTD knew of the unsafe condition; and DOTD failed to remedy the condition. The placement of a temporary concrete median barrier within the construction zone would have protected the traveling public from the danger of head-on collisions. DOTD had a duty to install the barrier, but failed to do so.[2] This assignment is without merit.

B. Use of the AASHTO Guide
DOTD argues the trial court erred in allowing the use of the American Association of State Highway and Transportation Officials (AASHTO) Guide for Selecting, Locating, and Designing Traffic Barriers for the purpose of establishing a duty to provide a temporary concrete median barrier. Before trial, DOTD filed a motion in limine, contending the AASHTO Barrier Guide was not admissible because it did not specifically cover temporary construction projects. The trial judge denied the motion, allowing the Guide to be introduced.
The Introduction to the Guide states "the contents are intended as "guidelines" and "application of these guidelines must be made in conjunction with sound evaluation of the facts and engineering judgment to effect the proper solution." [Emphasis in original.] In addition, the Guide does not specifically restrict its use to permanent construction, nor prohibit its application to temporary construction. However, LSA-R.S. 48:35A(3), which establishes the minimum safety standards of highway design, maintenance, and construction, requires:

*648 Prior to January 1, 1987, the office of highways of the Department of Transportation and Development shall adopt specific minimum safety standards with respect to highway and bridge design, construction, and maintenance for all public roads, highways, and streets under the jurisdiction of any political subdivision of this state and not in the state maintained highway system. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials....
This statutory requirement dictates the application of AASHTO guidelines whenever possible. The judge, in the charge to the jury, stated the statutory requirement that the AASHTO guidelines be followed "so far as possible." It was not error for the trial court to allow the introduction of the Guide. This assignment is without merit.

C. Exclusion of Testimony by DOTD and FHWA Engineers (DOTD # 4)
DOTD also argues it was error for the trial court to exclude expert testimony by DOTD and Federal Highway Administration (FHWA) officials and engineers pertaining to FHWA's position concerning installation of a median barrier.
The trial judge has discretion in conducting a trial. The judge is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. art. 1631. The judge's discretion includes the order of presentation of witnesses, LSA-C.C.P. art. 1632, as well as the admissibility of a witness's testimony. LSA-C.C.P. art. 1631; Combs v. Hartford Insurance Company, 544 So.2d 583, 586 (La. App. 1st Cir.), writ denied, 550 So.2d 630 (1989). The trial judge has great discretion in the manner in which proceedings are conducted before his court, and it is only upon a showing of a gross abuse of discretion that appellate courts have intervened. Sullivan v. Welch, 328 So.2d 731, 735 (La.App. 3rd Cir.1976). In the instant case, when DOTD officials alluded to or discussed FHWA's position or actions[3] concerning the median barrier, the trial judge excluded the testimony, stating, "Don't get involved in the federal government.... They're not in this lawsuit." DOTD contends that a median barrier proposal would have been rejected by FHWA; however, Plan Change No. 10 was never formally submitted to FHWA. Without an actual, formal request to FHWA by DOTD, it can merely be speculated what FHWA would have done.
Although hypothetical questions can be properly posed, they should not be based on unproven facts. Combs v. Hartford, 544 So.2d at 587. In the instant circumstances, in order for the testimony or opinion sought to be admitted by DOTD to be proper, both the content of a formal request to FHWA and any recommendations or rejection by DOTD would have to be assumed to be true. The trial court's exclusion of speculative testimony was proper. See, Mergen v. Piper Aircraft Corp., 524 So.2d 1348, 1352 (La.App. 1st Cir.), writs denied, 532 So.2d 154, 155, 156 (1988). This assignment is without merit.

D. Excluding Statistical Evidence (DOTD # 5)
DOTD argues the trial court erred when it limited cross-examination which excluded critical statistical evidence. During cross-examination of plaintiffs' experts, Mr. Jarvis Michie and Dr. Olin Dart, defense counsel sought to elicit testimony concerning statistics of fatal accidents which had occurred at the location of the accident in the instant case during the time period prior to the construction project. Defense counsel also sought statistical comparisons between fatalities in this construction zone and fatalities nationwide. On both occasions, counsel for plaintiffs objected to the evidence and comparisons. The trial judge, on each occasion, sustained the objection, ruling the testimony irrelevant.
However, during direct examination of DOTD's expert witness, Mr. Joseph Blaschke, an expert in highway design and *649 traffic engineering, the following exchange took place:
Q. Now for this particular stretch of highway, which is again the only data that Mr. Michie and yourself had to review, do we know the number of fatal accidents that occurred while the traffic was moved north of the permanent median, that is in the configuration at the time of the Pino accident?
A. Yes, sir.
* * * * * *
Q. How many fatal accidents did we have during the 17-month period I believe you referred to while the traffic was moved north of that median barrier?
A. There were two.
* * * * * *
Q. [Y]ou did review or you did analyze or review the particular data for fatal accidents on this stretch of highway for the 17 months during construction and I believe you've already testified there were two.
A. Correct.
Q. Now, that's during the configuration without a temporary concrete median barrier, right?
A. Yes.
* * * * * *
Q.... Did you also analyze the 17 months before the traffic was placed in this configuration?
A. Yes, sir.
* * * * * *
Q. In your analysis of that 17 months before it was placed in this configuration how many fatal accidents were there?
A. Two.
Q. So you had the same number of fatal accidents before and you have the same number of fatal accidents after it's placed in this configuration.
A. That's correct.
* * * * * *
Q. Had you performed some calculations considering how this compared to the national average?
A. I calculated the rate, the fatal accident rate which was the same for this roadway before the changeover and then after the changeover.
Q. How does that compare to the national average?
A. The fatal accident rate for Interstate 12 was 1.2, which was less than 2.3 [the national average]. It's less than the national average.
The calculations of the fatal accident rate testified to by the witness were made using a daily traffic count of 48,000. Dr. Blaschke then calculated the fatal accident rate using a 70,000 average daily traffic count, an estimation made by witnesses during the trial. He testified as follows:
Q. So the difference in comparing it [fatal accident rate using a higher daily traffic count] to the national average is 2.3 versus 1.0?
A. Thereabouts, yes, sir.
Q. And that's during construction?
A. Yes, sir.
During this examination of Dr. Blaschke, opposing counsel objected; however, the judge allowed the testimony. Thus, any error which may have occurred earlier, when the trial judge limited cross-examination of plaintiffs' experts, was harmless. The statistics and comparisons sought to be included in the record during cross-examination were included during Dr. Blaschke's direct testimony. This assignment is without merit.

E. Plaintiffs' Experts Qualifications (DOTD #9)
DOTD argues the trial court improperly allowed plaintiffs' witnesses, Mr. Michie and Dr. Dart, to give expert opinion testimony concerning reasonable engineering judgments made in the areas of highway design, construction, geometrics, and traffic control planning. DOTD contends neither Mr. Michie nor Dr. Dart had any expertise whatsoever in these areas, and they were unqualified to render an expert opinion concerning the decision making standards that apply in these areas.
*650 Testimony by experts is governed by LSA-C.E. art. 702, which states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The Fourth Circuit, in Carter v. Deitz, 556 So.2d at 868, discussed expert witnesses and their roles in a courtroom, stating: "Expert witnesses provide jurors with a base of knowledge, background information on subjects at issue which are not possessed by the general public. The expert provides the jury with the knowledge he has gained through specialized training and experience...."
Comment (d) to LSA-C.E. art. 702 explains, "[b]road discretion should be accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." Additionally, the trial judge's much discretion will not be disturbed on appeal absent manifest error. Brown v. Morgan, 449 So.2d 606, 608 (La.App. 1st Cir.1984).
Mr. Michie testified he is a licensed engineer in Texas and Louisiana, with a Masters degree in Civil Engineering. He worked from 1968 until 1985 for the Southwest Research Institute. Mr. Michie's work was concentrated in the area of highway safety and developing new roadside devices, such as median barriers, guardrails, bridge rails and supports, and sign supports. He developed national standards for testing roadside devices, and authored over 100 articles and reports on highway safety, including many which dealt with construction zones and median barriers in construction zones. In other litigation, Mr. Michie has been qualified by state courts in the field of highway safety engineering and highway accident reconstruction.
Dr. Dart testified he received his bachelor's degree, master's degree, and Ph.D. in civil engineering and has taught civil engineering for 21 years at LSU in Baton Rouge. He is a licensed civil engineer in Louisiana, Alabama and New York. Dr. Dart has authored 19 articles in the field of traffic engineering and traffic safety.
It is clear that Mr. Michie and Dr. Dart possess the requisite knowledge, experience, and education to be admitted as experts and testify as to their opinions in the fields of highway safety and construction. While the specialized terminology employed by DOTD, including "geometrics" and "traffic control planning" arguably seems to exclude Mr. Michie's and Dr. Dart's opinion testimony, we are not persuaded. Both witnesses possess specific knowledge of highway construction which encompasses both geometrics, the use of lines, curves and shapes in design, and the planning of traffic control. This assignment is without merit.

II.

FINDING DOTD'S FAILURE TO INSTALL BARRIER CAUSE-IN-FACT OF ACCIDENT (DOTD # 2)
DOTD asserts the trial court erred when it found that DOTD's decision not to place barriers in the median area was negligence constituting a cause-in-fact of the fatalities and the injuries incurred. They argue the cause of the accident in question herein was not the lack of a barrier but, rather, the careless operation by a tortfeasor of his automobile.
In Landry v. State Farm Insurance Company, 529 So.2d 417, 420-421 (La.App. 1st Cir.1988), we reviewed the law regarding causation under the duty-risk analysis, stating:
A defendant's conduct is actionable under the duty-risk analysis where it is both a cause in fact of the injury and a legal cause of the harm incurred. The cause in fact test requires that but for the defendant's conduct, the injuries would not have been sustained.... Further, there can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm which occurs and it is substantial in nature. [Citations omitted.]
The cause-in-fact test in a negligence action requires that but for the defendant's *651 conduct, the injuries would not have been sustained. In the instant case, but for the absence of a median barrier, Gauthier's truck would not have skidded across the safety zone, into the oncoming lane of traffic. The barrier would have halted the forward progress of the truck, preventing the head-on collision.
That Gauthier and/or R.P.M. may have also acted negligently does not change the finding that DOTD's failure to place median barriers was a cause-in-fact of the accident. There can be more than one cause-in-fact of an accident. The legal cause test requires that there be a substantial relationship between the conduct complained of and the harm incurred. Sinitiere v. Lavergne, 391 So.2d at 825. If a substantial relationship exists between the conduct complained of and the harm incurred, then the legal cause test is met.
The conduct complained of is the failure of DOTD to install a median barrier between the on-coming lanes of traffic within the detoured construction area. The particular harm incurred was the head-on collision which resulted from Gauthier's truck skidding across the safety zone. The significant inquiry is whether the duty to install a barrier was designed, at least in part, to afford the traveling public protection from head-on collisions. See, Dixie Drive It Yourself Sys. New Orleans Company, Inc. v. American Beverage Co., 242 La. 471, 137 So.2d 298, 304 (La.1962).
It is clear from the testimony, the AASHTO Guide and other evidence that barriers "redirect" and "decelerate errant vehicles" to a stop.[4] They are designed and installed to protect against head-on collisions, the very risk encountered by Sharon Pino and Mr. Green. To deny plaintiffs recovery would make the duty of DOTD pointless and protection for its breach meaningless. This assignment is without merit.

III.

EXCULPATING BARBER BROTHERS (DOTD # 8, Pinos # 1)
Both DOTD and the Pinos assign as error the trial court's exculpating Barber Bros. from liability. They argue that, in light of the indemnity provision contained in the contract between DOTD and Barber Bros., Barber Bros. is liable to DOTD for full indemnification for Barber Bros.' actions in causing the accident.
DOTD contends Barber Bros.' liability centers around two issues: A) whether the road surface in the area of the subject accident was defective; and B) whether Barber Bros. made reasonable efforts to control the speed of vehicles through the construction zone.

A. Condition of Road Surface
Under the contract, Barber Bros. was responsible for maintaining the condition of the road surface during the course of the project. However, as acknowledged by DOTD in their brief, there was no testimony during the course of the 11-day trial that indicated that the condition of the road made the road unreasonably hazardous to a prudent motorist.
A review of the evidence and testimony reveals the surface of the two west-bound lanes of Interstate-12 at the location of the accident were of different materials. As specified by the plans designed by DOTD, one was concrete and one was asphalt. However, no witness testified that this difference created an unreasonable hazard or that this difference was a defect in the road surface. It was not error by the trial court to find no liability on Barber Bros. based on the condition of the road surface.

B. Speed of Traffic
Throughout the trial in the instant case, testimony was heard of the concerns by all involved about the speed of vehicles through the construction zone. The traveling public, in general, did not observe the posted 45 miles per hour speed limit. Individuals from both DOTD and Barber Bros. were aware of the problem and letters were sent to DOTD officials, as well as local and state police departments, requesting help in enforcing the posted 45 miles per hour speed *652 limit. However, Barber Bros. had no authority to actually enforce the speed limit. Their responsibility was to post speed limit signs within the construction area.
The failure on the part of the traveling public to obey the posted speed limit does not make Barber Bros. liable for the damages sustained by the plaintiffs. This assignment is without merit.
Therefore, we affirm that portion of the judgment finding no liability on Barber Bros.

IV.

EXCLUDING VIDEOTAPE (Gauthier #2)
Gauthier assigns as error the trial court excluding a computer simulation videotape produced by Mr. Robert Ervin, an expert in vehicle dynamics.
The admissibility of a videotape is largely within the discretion of the trial judge. LaFleur v. John Deere Co., 491 So.2d 624, 632 (La.1986). In Malbrough v. Wallace, 594 So.2d 428, 431 (La.App. 1st Cir. 1991), writ denied, 596 So.2d 196 (1992), we recently discussed the admissibility of videotapes. We stated therein:
Determination of the admissibility into evidence of videotapes must be done on a case-by-case basis depending on the individual facts and circumstances of each case. The trial court must consider whether the videotape accurately depicts what it purports to represent, whether it tends to establish a fact of the proponent's case, and whether it will aid the jury's understanding. Against those factors, the trial court must consider whether the videotape will unfairly prejudice or mislead the jury, confuse the issues, or cause undue delay. The trial court may exclude the evidence if the factors favoring admission are substantially outweighed by the factors against admission. Louisiana Code of Evidence articles 401-403 ... [Citations omitted.]
Mr. Ervin produced a videotape simulation depicting four scenarios of possible movement by Gauthier's truck immediately before the accident in the instant case. According to his testimony, the method of producing the videotape involves inserting variables, such as weight of the vehicle, speed, road conditions, and braking, into a specialized computer program. The computer then reconstructs the motion of the vehicle as it approaches the collision.
Counsel for the Pinos objected to the introduction of the videotape, based on the inability to change any of the variables and produce an alternative version of the videotape for the jury to view. The trial judge ruled the videotape inadmissible as "unduly prejudicial." After the trial court ruled the tape inadmissible, Mr. Ervin testified at length concerning his findings.
We agree with the trial court. The factors favoring admission are substantially outweighed by the factors against admission. Although the tape tended to establish a fact of Gauthier's case, that a cause-in-fact of the accident was the different surfaces of the two west-bound lanes, the limitation placed on opposing counsel to present alternative scenarios based on differing variables would have been prejudicial. It was proper to avoid the impact of the jury viewing the specially created tape, containing only favorable outcomes.
Gauthier's reliance on the case of United States Fidelity & Guaranty Company v. Hi-Tower Concrete Pumping Service, Inc., 574 So.2d 424, 438 (La.App. 2nd Cir.), writs denied, 578 So.2d 136, 137 (1991), is misplaced. In the Hi-Tower case, the jury was allowed to view a videotape of the cleanup operation of a specialized concrete pumper in order to familiarize its members with the nature of the equipment and the normal cleanup operation. This was necessary because the testimony as to the operation of the concrete pumping truck was abstract and extremely complicated, so that viewing of the tape showing the actual equipment was beneficial to the jury in understanding the manner in which the accident occurred.
In the instant case, Mr. Ervin's testimony was clear and understandable. It was not necessary for the jury to view a computer simulation to understand how a vehicle might lose control during a lane change maneuver. This assignment is without merit.

*653 V.

GRANTING OF JUDGMENT NOTWITHSTANDING THE VERDICT
DOTD argues that the trial judge's granting of a JNOV on his own judgment, which altered the assessment of fault against DOTD from 25 percent to 33 1/3 percent, was error. DOTD asserts the judge was without authority to grant a JNOV on his own judgment; that a JNOV was not the proper device to treat the disparity in decisions between the jury's verdict as to fault of DOTD (65 percent) and the judge's assessment of fault of DOTD (25 percent). Gauthier, R.P.M., and St. Paul also argue the JNOV amending the assessment of fault against Gauthier and R.P.M. from 1 percent and 34 percent respectively, to 33 1/3 percent each was error, asserting that the JNOV denied them of their right to a trial by jury. The Pinos argue the trial judge erred in granting a JNOV reducing the loss of consortium awards.

A. JNOV as to non-governmental defendants (Gauthier # 1)
A JNOV may be granted by the trial court, pursuant to LSA-C.C.P. art. 1811. A trial court is empowered to reapportion fault found by a jury by JNOV only if the strict standards for granting a JNOV have been met. Doming v. K-Mart Corporation, 540 So.2d 400, 402 (La.App. 1st Cir.1989). A JNOV is properly granted when a jury's verdict is one which reasonable people could not have rendered; if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Lilly v. Allstate Insurance Co., 577 So.2d 80, 83 (La.App. 1st Cir. 1990), writ denied, 578 So.2d 914 (La.1991).
This court, in Petitto v. McMichael, 588 So.2d 1144, 1147 (La.App. 1st Cir.1991), writ denied, 590 So.2d 1201 (La.1992), discussed the standard when granting a JNOV, and stated:
A trial court may grant a JNOV only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach a contrary verdict. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion must be denied. In considering a motion for JNOV, the trial court must construe all evidence and reasonable inferences to be made therefrom in favor of the party opposing the motion. Further, the trial court may not weigh the evidence, pass on the credibility of witnesses or substitute its own judgment for that of the jury. A JNOV can be granted by a trial court only when a jury's verdict is one which reasonable men could not have rendered. The standard to be applied by appellate courts in reviewing a grant of JNOV is whether the trial court's findings in rendering the JNOV were manifestly erroneous.
Once a trial court has concluded that a JNOV is warranted, it must then determine what is the proper allocation of fault to be assigned or the amount of damages to be awarded. This court stated in Rickerson v. Fireman's Fund Insurance Company, 543 So.2d 519, 523 (La.App. 1st Cir.1989):
The Coco [v. Winston Industries, Inc., 341 So.2d 332 (La.1976)] standard of review does not apply to a trial court's review of a jury's award. Therefore, after rendering the JNOV, the trial court should have rendered a de novo award based on his independent assessment of injuries and damages.
Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 834 (La.1991).
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial *654 judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
Anderson v. New Orleans Public Service, Inc., 583 So.2d at 832.
The question before this court is whether, considering the evidence in the light most favorable to defendants Gauthier and R.P.M., the trial court was manifestly erroneous in concluding that reasonable men could not have found Gauthier 1 percent at fault and R.P.M. 34 percent at fault in causing the accident.

JNOV AS TO GAUTHIER
Gauthier testified he was making a delivery for his employer in a truck supplied to him by his employer. He approached Interstate-12 from an entrance ramp, stopped for a stop sign before merging, and then accelerated and merged into the west-bound traffic. While proceeding westward on Interstate-12, another vehicle began to merge, and Gauthier attempted to change lanes. He stated, "I lost control of the vehicle when I started changing lanes." There was varying testimony concerning the issue of whether Gauthier was exceeding the posted speed limit.
The rear tires of the pick-up Gauthier was driving were worn. The depth of the tread on the left and right rear tires measured from zero to 4/32" tread. The vehicle belonged to R.P.M., and the company was responsible for the maintenance and upkeep of the truck; however, the owners of R.P.M. depended on Gauthier to inform them if the truck required any maintenance. We are not satisfied reasonable men could find Gauthier, as the driver of the truck, only 1 percent at fault. His failure to insure the truck had adequate tires and his failure to maintain control of his vehicle during a lane change maneuver requires a greater assessment of fault of Gauthier. Weighing these factors, we find reasonable men in the exercise of impartial justice could not reach different conclusions as to the assessment of only 1 percent fault to Gauthier. Thus, the trial judge properly granted the JNOV as to Gauthier.
However, we do not agree with the trial judge's assessment of 33 1/3 percent fault to Gauthier. A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). The Louisiana Supreme Court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
In granting the JNOV as to the three defendants, the trial judge noted:
My assessment of the case was that there were, again, three things that coalesced to cause the accident.
One, the condition of the tires on the RPM vehicle; two, the negligent speed under prevailing conditions of Mr. Gauthier and his failure to keep his vehicle under proper control, which are two elements with one party at negligence. In other words, you can't give him twice as much responsibility because I feel that he had two elements involved in his negligence. I believe the only thing the disparity of the surfaces resulted in was a somewhat more difficult control factor on the part of Mr. Gauthier when he entered the interstate, that is, had he not been going faster than he should have been going when entering the interstate and had he been maintaining adequate control at that time the difference in surfaces wouldand had the vehicle had the proper tires on itnot have presented a problem.
We conclude, after a thorough review of the record, that the trial judge erred in his finding that Gauthier was negligently speeding. The speed limit where the accident *655 occurred was 45 miles per hour. Gauthier testified that he was going approximately 40 miles per hour. Shirley Patty, the only eyewitness to the accident, testified that the truck did not appear to be going fast. She further testified that she did not know if the truck was speeding or going fast.
The experts differed as to the speed of Gauthier's vehicle. Robert Ervin, an expert in vehicle dynamics called by R.P.M. did a computer assisted reenactment and indicated that the Gauthier vehicle would lose control at 47 miles per hour.
Ray Herd, an accident reconstructionist hired by the plaintiff, testified that he felt that Gauthier was driving "in the 55 mile per hour range." However, in his deposition, he had indicated that Gauthier was driving between 50 and 55 miles per hour. Herd further indicated that the speed at impact was only estimated. Herd admitted that it was difficult to testify as to the speed of the Gauthier vehicle because of the secondary collisions which occurred in this accident.
Jarvis Michie, tendered as an expert in highway safety engineering by plaintiffs, admitted that it was very difficult to determine speed where several impacts occur.
Thus, the trial court could not have concluded that Gauthier was negligently speeding. We find that the record supports an assessment of 20 percent fault to Gauthier. Thus, we affirm the granting of the JNOV as to Gauthier; however, we amend the assessment of fault to Gauthier from 33 1/3 percent to 20 percent.

JNOV AS TO R.P.M.
R.P.M., as the owner of the truck, was found by the jury to be 34 percent at fault. The trial judge granted the JNOV as to R.P.M. and assigned R.P.M. 33 1/3 percent fault. We find the trial judge's granting of the JNOV as to R.P.M. to be manifestly erroneous. The jury's assessment of 34 percent fault to R.P.M. is one which reasonable men could render. R.P.M., as the owner of the vehicle, was responsible for maintaining the truck. The lack of sufficient tread on the rear tires was a cause-in-fact of the accident. Therefore, the assessment of 34 percent fault to R.P.M. is reasonable. We hereby reverse the granting of the JNOV as to R.P.M. and reinstate the jury's allocation of 34 percent fault to R.P.M.

B. JNOV As To DOTD (DOTD # 6)
DOTD further alleges that the trial judge erred when it granted a JNOV as to his original judgment rendered against DOTD. We agree. It was improper for the trial court to grant a JNOV on his own judgment. A JNOV is a procedural device which can be used to correct the jury's verdict. Use of a JNOV by the trial judge to modify or correct his own judgment is not proper. Thus, the trial judge erred in granting the JNOV on his own judgment. We hereby reverse the trial judge's granting of a JNOV as to DOTD. The resulting judgment, assessing DOTD 33 1/3 percent fault, is invalid.
We agree with DOTD's contention that the proper procedural vehicle for the trial judge to utilize to reconsider the percentage of fault assessed to DOTD would have been to grant a motion for new trial as to DOTD.[5] Under LSA-C.C.P. art. 1971, the trial court may, by motion of any party or by its own motion, grant a new trial to all or any of the parties and on all or part of the issues, or for reargument only. A trial judge may grant a new trial if there is good ground therefore. LSA-C.C.P. art. 1973.
Because the trial judge erred in granting the JNOV as to his own judgment, we must now review his original assessment of 25 percent fault to DOTD. As stated earlier, a trial court's finding of fact may not be set aside in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d at 844. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
*656 We conclude that the assessment of 25 percent fault to DOTD by the trial judge was manifestly erroneous. DOTD designed the repair and construction project of Interstate-12 to include the detour of all traffic to the west-bound lanes. The design by DOTD failed to provide a median barrier within the open area between opposing lanes of traffic. During the design phase, the installation of a temporary concrete median barrier to separate the oncoming traffic was considered, but rejected. Later, during construction, both DOTD engineers and construction personnel on site sought to incorporate the median barrier by submitting Plan Change No. 10. However, officials of DOTD rejected the request.
The failure by DOTD to use a temporary concrete median barrier, designed to redirect and decelerate errant vehicles, within this construction zone requires the assessment of the greatest fault to DOTD. We find the proper allocation of fault assigned to DOTD should be 46 percent. We therefore amend that portion of the judgment allocating 33 1/3 percent fault against DOTD to provide for the allocation of 46 percent fault to DOTD.

C. JNOV reducing loss of consortium awards.
The Pinos assign as error the trial court's granting of a JNOV reducing the loss of consortium awards made by the jury from $250,000.00 each to $150,000.00 each. However, Gauthier contends the loss of consortium awards are excessive.
LSA-C.C. art. 2315 gives parents a cause of action for loss of consortium when their child is injured by the fault of another. In Lee v. USAA Casualty Insurance Company, 540 So.2d 1083 (La.App. 1st Cir.), writs denied, 542 So.2d 514, 515 (1989), and Worsham v. Walker, 498 So.2d 260 (La.App. 1st Cir.1986), writs denied, 500 So.2d 423, 424 (1987), we discussed an award for loss of consortium in a parent-child context. The loss suffered by the parent is based on "loss of the aid, assistance and companionship of the child," Worsham, 498 So.2d at 266, and "loss of affection, society and service." Lee, 540 So.2d at 1093.
Before the accident, Sharon Pino was a 19-year-old healthy, active, involved young lady. She was living at home, planning her upcoming wedding, and the birth of her first child. She had a close, loving relationship with her family. After the accident, Sharon's intellectual learning range decreased significantly, to the slow learning range. Sharon has significant behavioral problems, needs 24-hour-a-day supervision, and has poor problem solving and reasoning skills. In the instant case, we can easily see the Pinos suffered loss.
The jury awarded the Pinos $250,000.00 each. The trial judge granted a JNOV, reducing the award to $150,000.00 each. We believe the granting of a JNOV was proper.
In reviewing a general damage award, a court may disturb an award of general damages only after an analysis of the facts demonstrates that the trier of fact abuse its "much discretion" in granting the award. See Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977).
In Youn v. Maritime Overseas Corp., 623 So.2d at 1260, the Louisiana Supreme Court articulated the following standard for reviewing general damage awards:
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior award appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. (Citations omitted).
After a thorough review of the record, we conclude that the trier of fact did not abuse its discretion in granting general damages to the Pinos for their loss of consortium. Having determined that there was no abuse of discretion, we need not resort to a review of prior cases. Accordingly, we affirm that portion of the trial court's judgment relating *657 to the general damages awarded to the Pinos for their loss of consortium.

VI.

QUANTUM (DOTD # 7, Gauthier #3, Pinos #3)
Finally, DOTD, Gauthier, and the Pinos all assign as error the damage award. DOTD argues the judge's adoption of the jury's quantum award was error, as this subjected DOTD to a trial by jury, prohibited by LSA-R.S. 13:5105. Gauthier argues the amount awarded for future medical care was excessive. The Pinos assert the amount awarded for general damages was inadequate.

A. Trial judge adoption of jury's quantum
DOTD argues the adoption of the jury's quantum award by the judge subjected DOTD to a prohibited jury trial.[6] We disagree.
In this lawsuit DOTD, Gauthier, R.P.M., St. Paul, Barber Bros., and Liberty Mutual are all party defendants. The suit was tried simultaneously before the jury (defendants Gauthier, R.P.M., St. Paul, Barber Bros., and Liberty Mutual) and the trial judge (defendant DOTD).
LSA-C.C.P. art. 1812 C provides, in pertinent part:
In cases to recover damages for injury, death, or loss, the court may submit to the jury special written questions inquiring as to:
(1) Whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
(2) If appropriate, whether another person, whether party or not, other than the person suffering injury, death, or loss, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
(3) If appropriate, whether there was negligence attributable to any party claiming damages, and, if so:
(a) Whether such negligence was a legal cause of the damages, and, if so:
(b) The degree of such negligence, expressed in percentage.
(4) The total amount of damages sustained as a result of the injury, death, or loss, expressed in dollars.
As the Supreme Court stated in Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308, 1310 (La.1984):
La.C.C.P. art. 1812 C(2) does not offend R.S. 13:5105's prohibition of jury trial against public agencies. It is a procedural statute which implements Louisiana's comparative fault scheme (C.C. 2323) and which the legislature determined was necessary to the appropriate determination of damages to which plaintiff is entitled against the private defendant, (in this case N.O.P.S.I.). [emphasis in original]
It is not an advisory opinion in that it is not designed to advise, counsel, or compel the trial judge in his independent judicial obligation as regards plaintiff's claim against the public agency. Rather La. C.C.P. art. 1812 merely facilitates the court's confecting a judgment consistent with the jury determination relative to plaintiff's entitlement in his claim against the private defendant.
At best it might be argued that the jury's answers concerning Sewerage and Water Board's fault and percentage of contributing fault might influence the trial judge in his determination in plaintiff's suit against the public agency.
That problem, however, is present in every case where simultaneous trials are conducted, one to the jury and one to the judge, where a private party and a public agency are defendants in a case arising out of a single incident. That has not been *658 deemed an insurmountable obstacle by this Court.
We believe the above stated language is clearly appropriate in the discussion of the application of La.C.C.P. art. 1812 C(4) as well. The trial court in the instant case, after rendering judgment against DOTD, stated he would take the matter of quantum under advisement, pending further consideration by the court. The trial court, in fact, had further considerations, as evidenced by the granting of a JNOV, and a reduction of the loss of consortium awards to the Pinos.
The trial judge was well aware of the separateness of the simultaneous trials that were being held. His judgment as to quantum, whether by adoption of some portion of the jury's award of quantum, or by his own judgment, and then the granting of a JNOV and rendering of differing amounts clearly demonstrates that the trial judge fulfilled his independent judicial obligation in the instant case. This assignment is without merit.

B. Amount of Future Medical Costs
Gauthier assigns as error the award of future medical costs. The judgment awarded Sharon $3,000,000.00 for future medical costs.
Medical experts presented costs estimates of the future "Life Care Plan" (including medical costs) for Sharon. Plaintiffs' experts testified this amount to be either $4.3 million or $6.5 million, depending on the necessity of particular elements of the plan and an estimated future inflation rate. Defendant's expert estimated costs to be between $1.4 million and $2.9 million.
The jury's determination that $3,000,000.00 would adequately provide for the future medical costs incurred by Sharon was within the range of calculations presented. It is supported by the evidence. We find no abuse in the jury's much discretion in determining the award for the cost of medical services which plaintiff will require in the future. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). This assignment is without merit.

C. Amount of General Damages
The amount awarded to Sharon for general damages was $1,000,000.00. The Pinos argue this amount is inadequate.
Sharon's life was forever changed by the injuries she sustained. The pain and suffering she has borne and the frustrations and disappointments yet to bear are great. There is no question that the circumstances of this case justify a substantial general damage award. However, we cannot say the award of $1,000,000.00 is an abuse of the jury's discretion. Reck v. Stevens, 373 So.2d at 501. We will not disturb this jury award.

CONCLUSION
For the foregoing reasons, we amend the judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that Ferman V. Gauthier's motion for judgment notwithstanding the verdict is hereby granted as to Ferman V. Gauthier, and fault is hereby assessed as follows:
Ferman V. Gauthier ... 20%
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that fault is assessed against State of Louisiana, through the Department of Transportation and Development as follows:
State of Louisiana, through the Department of Transportation and Development... 46%
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that R.P.M.'s and DOTD's motion for judgment notwithstanding the verdict is hereby denied as to R.P.M. and State of Louisiana, through the Department of Transportation and Development.
Costs of this appeal in the amount of $8,949.07 are to be paid by the defendants in proportion to their liability. La.C.C.P. art. 2164; Blanchard v. Rodrigue, 340 So.2d 1001, 1009 (La.App. 1st Cir.1976), writs denied, 341 So.2d 1129, 1130 (1977).
AFFIRMED IN PART; REVERSED IN PART, AND RENDERED.
LeBLANC, J., concurs in part and dissents in part and assigns reasons.
*659 LeBLANC, Judge (concurring in part and dissenting in part).
I concur in part and dissent in part.
Although I agree the granting of a JNOV reducing the loss of consortium awards made by the jury was proper, the award made by the trial court was an abuse of discretion. The award is based on the loss of aid, assistance and companionship. It is not based on mental anguish or pain and suffering. It is that amount which will compensate the parent for the aid, assistance and service which the child would have provided to the parent. It also includes an amount which represents the loss of affection and society suffered by the parents.
In Lee, 540 So.2d at 1091, we discussed appellate review of quantum awards, stating:
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. In the final analysis, the damages due in a given case must reflect the facts and circumstances of that case. [Citations omitted.]
I believe it was an abuse of discretion to award $150,000.00 each to the Pinos. I do not believe the record supports an award to the Pinos for loss of consortium with Sharon of $150,000.00 each.
I find the medical and personal testimony contained in the record only supports an award of $100,000.00 as the highest amount to award each of Sharon Pino's parents for their loss of consortium. See, Lee, 540 So.2d at 1093.
NOTES
[1] The tunneling effect may be summarized as the problems which occur when there is no access to the travel lanes because of barriers or walls on both sides. These problems include difficulty in reaching stalled or disabled vehicles or injured individuals with emergency equipment and the increased incidence of rear-end collisions.
[2] DOTD relies on the cases of Utley v. State, 570 So.2d 501 (La.App. 5th Cir.1990), writs denied, 573 So.2d 1121, 1122 (1991), Carter v. Deitz, 556 So.2d 842 (La.App. 4th Cir.), writs denied, 566 So.2d 960, 992, 993 (1990), and Seymour v. LaCava, 522 So.2d 683 (La.App. 5th Cir.), writ denied, 523 So.2d 1342 (1988), to support its argument that DOTD had no duty to erect a temporary concrete median barrier. However, we find these cases distinguishable and unpersuasive on the issue of DOTD's duty within a construction zone.

In Utley, the four lane highway was divided by a median which was six to eight feet wide. The median consisted of a six inch high cement curbing along the roadway with grass in between. The road met all design specifications when it was built. The court found fault on the part of the driver, coupled with the defective shoulder of the road, as the cause of the accident in that case. On that showing, the court in Utley declined to find that the lack of a median barrier was a defect in the roadway which rendered it unreasonably dangerous.
In Carter, the court found the absence of a median barrier on the Greater New Orleans Bridge (GNOB) did not cause the bridge to be unreasonably dangerous. When designed, in the 1950's, the GNOB was in accordance with the engineering standards current then, and the court noted no duty to upgrade roads to present standards. In the 1970's, concern over increased fatalities prompted the Mississippi River Bridge Authority to authorize bridge safety studies to be conducted by a professional engineering firm. The court determined that whether a median barrier should have been installed on the bridge was a complex, multi-factor issue, and that the absence of a barrier did not cause the GNOB to be unreasonably dangerous. However, the issue before the court in Carter was the burden of proof on the plaintiff to establish the professional standards by which the engineering firm was to be judged.
Seymour, likewise, concerned the duty to upgrade an existing roadway. An approximately ten inch high, curbed divider separated the north and south-bound lanes of traffic on the Pontchartrain Expressway in New Orleans. The Expressway was built in accordance with acceptable design standards in effect at the time of planning and construction. The court in Seymour held DOTD had no duty to erect a more modern barricade, and that "a highway that met minimum safety standards when constructed but did not meet revised upgraded minimum standards when the accident occurred, was not so hazardous as to be unsafe to a careful and prudent driver." Seymour v. LaCava, 522 So.2d at 685 (quoting Dagnall v. Louisiana Department of Highways, 426 So.2d 276, 277 (La.App. 4th Cir.), writ denied, 433 So.2d 160 (1983).
These cases address the duty of upgrading a roadway which met current minimum safety standards when constructed. They are inapplicable to the present case which involves the duty owed by DOTD in a construction zone.
[3] The FHWA was funding 90% of the Interstate-12 construction and repair project.
[4] AASHTO Guide Introduction, p. 3.
[5] Although the Pinos, McClin, Gauthier, R.P.M., and St. Paul sought consideration and review of both the jury verdict and the judgment by filing motions seeking a judgment notwithstanding the verdict and/or motion for new trial, they have not appealed the denial of the motion for new trial.
[6] La.R.S. 13:5105.